IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. |
| v. | * | |
| | * | (18 U.S.C. §§ 2, 371, 1349, 1028A) |
| INTERNET RESEARCH AGENCY LLC | * | |
| A/K/A MEDIASINTEZ LLC A/K/A | * | |
| GLAVSET LLC A/K/A MIXINFO | * | |
| LLC A/K/A AZIMUT LLC A/K/A | * | |
| NOVINFO LLC, | * | |
| CONCORD MANAGEMENT AND | * | |
| CONSULTING LLC, | * | |
| CONCORD CATERING, | * | |
| YEVGENIY VIKTOROVICH | * | |
| PRIGOZHIN, | * | |
| MIKHAIL IVANOVICH BYSTROV, | * | |
| MIKHAIL LEONIDOVICH BURCHIK | * | |
| A/K/A MIKHAIL ABRAMOV, | * | |
| ALEKSANDRA YURYEVNA | * | |
| KRYLOVA, | * | |
| ANNA VLADISLAVOVNA | * | |
| BOGACHEVA, | * | |
| SERGEY PAVLOVICH POLOZOV, | * | |
| MARIA ANATOLYEVNA BOVDA | * | |
| A/K/A MARIA ANATOLYEVNA | * | |
| BELYAEVA, | * | |
| ROBERT SERGEYEVICH BOVDA, | * | |
| DZHEYKHUN NASIMI OGLY | * | |
| ASLANOV A/K/A JAYHOON | * | |
| ASLANOV A/K/A JAY ASLANOV, | * | |
| VADIM VLADIMIROVICH | * | |
| PODKOPAEV, | * | |
| GLEB IGOREVICH VASILCHENKO, | * | |
| IRINA VIKTOROVNA KAVERZINA, | * | |
| and | * | |
| VLADIMIR VENKOV. | ******* | |

Defendants.

**INDICTMENT**

The Grand Jury for the District of Columbia charges:

**Introduction**

1.       The United States of America, through its departments and agencies, regulates the activities of foreign individuals and entities in and affecting the United States in order to prevent, disclose, and counteract improper foreign influence on U.S. elections and on the U.S. political system.  U.S. law bans foreign nationals from making certain expenditures or financial disbursements for the purpose of influencing federal elections.  U.S. law also bars agents of any foreign entity from engaging in political activities within the United States without first registering with the Attorney General.  And U.S. law requires certain foreign nationals seeking entry to the United States to obtain a visa by providing truthful and accurate information to the government.  Various federal agencies, including the Federal Election Commission, the U.S. Department of Justice, and the U.S. Department of State, are charged with enforcing these laws.

2.       Defendant INTERNET RESEARCH AGENCY LLC ("ORGANIZATION") is a Russian organization engaged in operations to interfere with elections and political processes.  Defendants MIKHAIL IVANOVICH BYSTROV, MIKHAIL LEONIDOVICH BURCHIK, ALEKSANDRA YURYEVNA KRYLOVA, ANNA VLADISLAVOVNA BOGACHEVA, SERGEY PAVLOVICH POLOZOV, MARIA ANATOLYEVNA BOVDA, ROBERT SERGEYEVICH BOVDA, DZHEYKHUN NASIMI OGLY ASLANOV, VADIM VLADIMIROVICH PODKOPAEV, GLEB IGOREVICH VASILCHENKO, IRINA VIKTOROVNA KAVERZINA, and VLADIMIR VENKOV worked in various capacities to carry out Defendant ORGANIZATION's interference operations targeting the United States.  From in or around 2014 to the present, Defendants knowingly and intentionally conspired with each other (and with persons known and unknown to

the Grand Jury) to defraud the United States by impairing, obstructing, and defeating the lawful functions of the government through fraud and deceit for the purpose of interfering with the U.S. political and electoral processes, including the presidential election of 2016.

3.      Beginning as early as 2014, Defendant ORGANIZATION began operations to interfere with the U.S. political system, including the 2016 U.S. presidential election.   Defendant ORGANIZATION received funding for its operations from Defendant YEVGENIY VIKTOROVICH PRIGOZHIN and companies he controlled, including Defendants CONCORD MANAGEMENT AND CONSULTING LLC and CONCORD CATERING (collectively "CONCORD").  Defendants CONCORD and PRIGOZHIN spent significant funds to further the ORGANIZATION's operations and to pay the remaining Defendants, along with other uncharged ORGANIZATION employees, salaries and bonuses for their work at the ORGANIZATION.

4.      Defendants, posing as U.S. persons and creating false U.S. personas, operated social media pages and groups designed to attract U.S. audiences.  These groups and pages, which addressed divisive U.S. political and social issues, falsely claimed to be controlled by U.S. activists when, in fact, they were controlled by Defendants.  Defendants also used the stolen identities of real U.S. persons to post on ORGANIZATION-controlled social media accounts. Over time, these social media accounts became Defendants' means to reach significant numbers of Americans for purposes of interfering with the U.S. political system, including the presidential election of 2016.

5.      Certain Defendants traveled to the United States under false pretenses for the purpose of collecting intelligence to inform Defendants' operations.  Defendants also procured and used computer infrastructure, based partly in the United States, to hide the Russian origin of their activities and to avoid detection by U.S. regulators and law enforcement.

6.      Defendant ORGANIZATION had a strategic goal to sow discord in the U.S. political system, including the 2016 U.S. presidential election.  Defendants posted derogatory information about a number of candidates, and by early to mid-2016, Defendants' operations included supporting the presidential campaign of then-candidate Donald J. Trump ("Trump Campaign") and disparaging Hillary Clinton.  Defendants made various expenditures to carry out those activities, including buying political advertisements on social media in the names of U.S. persons and entities.  Defendants also staged political rallies inside the United States, and while posing as U.S. grassroots entities and U.S. persons, and without revealing their Russian identities and ORGANIZATION affiliation, solicited and compensated real U.S. persons to promote or disparage candidates. Some Defendants, posing as U.S. persons and without revealing their Russian association, communicated with unwitting individuals associated with the Trump Campaign and with other political activists to seek to coordinate political activities.

7.      In order to carry out their activities to interfere in U.S. political and electoral processes without detection of their Russian affiliation, Defendants conspired to obstruct the lawful functions of the United States government through fraud and deceit, including by making expenditures in connection with the 2016 U.S. presidential election without proper regulatory disclosure; failing to register as foreign agents carrying out political activities within the United States; and obtaining visas through false and fraudulent statements.

## COUNT ONE

### (Conspiracy to Defraud the United States)

8.      Paragraphs 1 through 7 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

9.      From in or around 2014 to the present, in the District of Columbia and elsewhere,

Defendants, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to defraud the United States by impairing, obstructing, and defeating the lawful functions of the Federal Election Commission, the U.S. Department of Justice, and the U.S. Department of State in administering federal requirements for disclosure of foreign involvement in certain domestic activities.

### Defendants

10.     Defendant INTERNET RESEARCH AGENCY LLC (Агентство Интернет Исследований) is a Russian organization engaged in political and electoral interference operations.  In or around July 2013, the ORGANIZATION registered with the Russian government as a Russian corporate entity.  Beginning in or around June 2014, the ORGANIZATION obscured its conduct by operating through a number of Russian entities, including Internet Research LLC, MediaSintez LLC, GlavSet LLC, MixInfo LLC, Azimut LLC, and NovInfo LLC.  Starting in or around 2014, the ORGANIZATION occupied an office at 55 Savushkina Street in St. Petersburg, Russia.  That location became one of the ORGANIZATION's operational hubs from which Defendants and other co-conspirators carried out their activities to interfere in the U.S. political system, including the 2016 U.S. presidential election.

     a.     The ORGANIZATION employed hundreds of individuals for its online operations, ranging from creators of fictitious personas to technical and administrative support. The ORGANIZATION's annual budget totaled the equivalent of millions of U.S. dollars.

     b.     The ORGANIZATION was headed by a management group and organized into departments, including: a graphics department; a data analysis department; a search-engine optimization ("SEO") department; an information-technology ("IT")

department to maintain the digital infrastructure used in the ORGANIZATION's operations; and a finance department to budget and allocate funding.

c. The ORGANIZATION sought, in part, to conduct what it called "information warfare against the United States of America" through fictitious U.S. personas on social media platforms and other Internet-based media.

d. By in or around April 2014, the ORGANIZATION formed a department that went by various names but was at times referred to as the "translator project." This project focused on the U.S. population and conducted operations on social media platforms such as YouTube, Facebook, Instagram, and Twitter. By approximately July 2016, more than eighty ORGANIZATION employees were assigned to the translator project.

e. By in or around May 2014, the ORGANIZATION's strategy included interfering with the 2016 U.S. presidential election, with the stated goal of "spread[ing] distrust towards the candidates and the political system in general."

11. Defendants CONCORD MANAGEMENT AND CONSULTING LLC (Конкорд Менеджмент и Консалтинг) and CONCORD CATERING are related Russian entities with various Russian government contracts. CONCORD was the ORGANIZATION's primary source of funding for its interference operations. CONCORD controlled funding, recommended personnel, and oversaw ORGANIZATION activities through reporting and interaction with ORGANIZATION management.

a. CONCORD funded the ORGANIZATION as part of a larger CONCORD-funded interference operation that it referred to as "Project Lakhta." Project Lakhta had multiple components, some involving domestic audiences within the Russian

Federation and others targeting foreign audiences in various countries, including the United States.

b.    By in or around September 2016, the ORGANIZATION's monthly budget for Project Lakhta submitted to CONCORD exceeded 73 million Russian rubles (over 1,250,000 U.S. dollars), including approximately one million rubles in bonus payments.

c.    To conceal its involvement, CONCORD labeled the monies paid to the ORGANIZATION for Project Lakhta as payments related to software support and development.   To further conceal the source of funds, CONCORD distributed monies to the ORGANIZATION through approximately fourteen bank accounts held in the names of CONCORD affiliates, including Glavnaya Liniya LLC, Merkuriy LLC, Obshchepit LLC, Potentsial LLC, RSP LLC, ASP LLC, MTTs LLC, Kompleksservis LLC, SPb Kulinariya LLC, Almira LLC, Pishchevik LLC, Galant LLC, Rayteks LLC, and Standart LLC.

12.   Defendant YEVGENIY VIKTOROVICH PRIGOZHIN (Пригожин Евгений Викторович) is a Russian national who controlled CONCORD.

a.    PRIGOZHIN approved and supported the ORGANIZATION's operations, and Defendants and their co-conspirators were aware of PRIGOZHIN's role.

b.    For example, on or about May 29, 2016, Defendants and their co-conspirators, through an ORGANIZATION-controlled social media account, arranged for a real U.S. person to stand in front of the White House in the District of Columbia under false pretenses to hold a sign that read "Happy 55th Birthday Dear Boss." Defendants and their co-conspirators informed the real U.S. person that the sign

was for someone who "is a leader here and our boss . . . our funder." PRIGOZHIN's

Russian passport identifies his date of birth as June 1, 1961.

13.     Defendant MIKHAIL IVANOVICH BYSTROV (Быстров Михаил Иванович) joined the

ORGANIZATION by at least in or around February 2014.

      a.     By approximately April 2014, BYSTROV was the general director, the

             ORGANIZATION's highest-ranking position. BYSTROV subsequently served as

             the head of various other entities used by the ORGANIZATION to mask its

             activities, including, for example, Glavset LLC, where he was listed as that entity's

             general director.

      b.     In or around 2015 and 2016, BYSTROV frequently communicated with

             PRIGOZHIN about Project Lakhta's overall operations, including through

             regularly scheduled in-person meetings.

14.     Defendant MIKHAIL LEONIDOVICH BURCHIK (Бурчик Михаил Леонидович)

A/K/A MIKHAIL ABRAMOV joined the ORGANIZATION by at least in or around October

2013.     By approximately March 2014, BURCHIK was the executive director, the

ORGANIZATION's second-highest ranking position. Throughout the ORGANIZATION's

operations to interfere in the U.S political system, including the 2016 U.S. presidential election,

BURCHIK was a manager involved in operational planning, infrastructure, and personnel. In or

around 2016, BURCHIK also had in-person meetings with PRIGOZHIN.

15.     Defendant ALEKSANDRA YURYEVNA KRYLOVA (Крылова Александра Юрьевна)

worked for the ORGANIZATION from at least in or around September 2013 to at least in or around

November 2014. By approximately April 2014, KRYLOVA served as director and was the

ORGANIZATION's third-highest ranking employee. In 2014, KRYLOVA traveled to the United

States under false pretenses for the purpose of collecting intelligence to inform the ORGANIZATION's operations.

16.    Defendant SERGEY PAVLOVICH POLOZOV (Полозов Сергей Павлович) worked for the ORGANIZATION from at least in or around April 2014 to at least in or around October 2016. POLOZOV served as the manager of the IT department and oversaw the procurement of U.S. servers and other computer infrastructure that masked the ORGANIZATION's Russian location when conducting operations within the United States.

17.    Defendant ANNA VLADISLAVOVNA BOGACHEVA (Богачева Анна Владиславовна) worked for the ORGANIZATION from at least in or around April 2014 to at least in or around July 2014.  BOGACHEVA served on the translator project and oversaw the project's data analysis group.  BOGACHEVA also traveled to the United States under false pretenses for the purpose of collecting intelligence to inform the ORGANIZATION's operations.

18.    Defendant MARIA ANATOLYEVNA BOVDA (Бовда Мария Анатольевна) A/K/A MARIA ANATOLYEVNA BELYAEVA ("M. BOVDA") worked for the ORGANIZATION from at least in or around November 2013 to at least in or around October 2014.  M. BOVDA served as the head of the translator project, among other positions.

19.    Defendant ROBERT SERGEYEVICH BOVDA (Бовда Роберт Сергеевич) ("R. BOVDA") worked for the ORGANIZATION from at least in or around November 2013 to at least in or around October 2014.  R. BOVDA served as the deputy head of the translator project, among other positions.  R. BOVDA attempted to travel to the United States under false pretenses for the purpose of collecting intelligence to inform the ORGANIZATION's operations but could not obtain the necessary visa.

20.     Defendant DZHEYKHUN NASIMI OGLY ASLANOV (Асланов Джейхун Насими Оглы) A/K/A JAYHOON ASLANOV A/K/A JAY ASLANOV joined the ORGANIZATION by at least in or around September 2014.  ASLANOV served as head of the translator project and oversaw many of the operations targeting the 2016 U.S. presidential election.  ASLANOV was also listed as the general director of Azimut LLC, an entity used to move funds from CONCORD to the ORGANIZATION.

21.     Defendant VADIM VLADIMIROVICH PODKOPAEV (Подкопаев Вадим Владимирович) joined the ORGANIZATION by at least in or around June 2014.  PODKOPAEV served as an analyst on the translator project and was responsible for conducting U.S.-focused research and drafting social media content for the ORGANIZATION.

22.     Defendant GLEB IGOREVICH VASILCHENKO (Васильченко Глеб Игоревич) worked for the ORGANIZATION from at least in or around August 2014 to at least in or around September 2016.  VASILCHENKO was responsible for posting, monitoring, and updating the social media content of many ORGANIZATION-controlled accounts while posing as U.S. persons or U.S. grassroots organizations.  VASILCHENKO later served as the head of two sub-groups focused on operations to interfere in the U.S. political system, including the 2016 U.S. presidential election.

23.     Defendant IRINA VIKTOROVNA KAVERZINA (Каверзина Ирина Викторовна) joined the ORGANIZATION by at least in or around October 2014.  KAVERZINA served on the translator project and operated multiple U.S. personas that she used to post, monitor, and update social media content for the ORGANIZATION.

24.     Defendant VLADIMIR VENKOV (Венков Владимир) joined the ORGANIZATION by at least in or around March 2015.  VENKOV served on the translator project and operated multiple

U.S. personas, which he used to post, monitor, and update social media content for the ORGANIZATION.

### Federal Regulatory Agencies

25.     The Federal Election Commission is a federal agency that administers the Federal Election Campaign Act ("FECA").  Among other things, FECA prohibits foreign nationals from making any contributions, expenditures, independent expenditures, or disbursements for electioneering communications.  FECA also requires that individuals or entities who make certain independent expenditures in federal elections report those expenditures to the Federal Election Commission. The reporting requirements permit the Federal Election Commission to fulfill its statutory duties of providing the American public with accurate data about the financial activities of individuals and entities supporting federal candidates, and enforcing FECA's limits and prohibitions, including the ban on foreign expenditures.

26.     The U.S. Department of Justice administers the Foreign Agent Registration Act ("FARA"). FARA establishes a registration, reporting, and disclosure regime for agents of foreign principals (which includes foreign non-government individuals and entities) so that the U.S. government and the people of the United States are informed of the source of information and the identity of persons attempting to influence U.S. public opinion, policy, and law.  FARA requires, among other things, that persons subject to its requirements submit periodic registration statements containing truthful information about their activities and the income earned from them.  Disclosure of the required information allows the federal government and the American people to evaluate the statements and activities of such persons in light of their function as foreign agents.

27.     The U.S. Department of State is the federal agency responsible for the issuance of non-immigrant visas to foreign individuals who need a visa to enter the United States.  Foreign

individuals who are required to obtain a visa must, among other things, provide truthful information in response to questions on the visa application form, including information about their employment and the purpose of their visit to the United States.

### Object of the Conspiracy

28.     The conspiracy had as its object impairing, obstructing, and defeating the lawful governmental functions of the United States by dishonest means in order to enable the Defendants to interfere with U.S. political and electoral processes, including the 2016 U.S. presidential election.

### Manner and Means of the Conspiracy

#### Intelligence-Gathering to Inform U.S. Operations

29.     Starting at least in or around 2014, Defendants and their co-conspirators began to track and study groups on U.S. social media sites dedicated to U.S. politics and social issues.  In order to gauge the performance of various groups on social media sites, the ORGANIZATION tracked certain metrics like the group's size, the frequency of content placed by the group, and the level of audience engagement with that content, such as the average number of comments or responses to a post.

30.     Defendants and their co-conspirators also traveled, and attempted to travel, to the United States under false pretenses in order to collect intelligence for their interference operations.

   a.     KRYLOVA and BOGACHEVA, together with other Defendants and co-conspirators, planned travel itineraries, purchased equipment (such as cameras, SIM cards, and drop phones), and discussed security measures (including "evacuation scenarios") for Defendants who traveled to the United States.

   b.     To enter the United States, KRYLOVA, BOGACHEVA, R. BOVDA, and another co-conspirator applied to the U.S. Department of State for visas to travel.  During

their application process, KRYLOVA, BOGACHEVA, R. BOVDA, and their co-conspirator falsely claimed they were traveling for personal reasons and did not fully disclose their place of employment to hide the fact that they worked for the ORGANIZATION.

c.  Only KRYLOVA and BOGACHEVA received visas, and from approximately June 4, 2014 through June 26, 2014, KRYLOVA and BOGACHEVA traveled in and around the United States, including stops in Nevada, California, New Mexico, Colorado, Illinois, Michigan, Louisiana, Texas, and New York to gather intelligence. After the trip, KRYLOVA and BURCHIK exchanged an intelligence report regarding the trip.

d.  Another co-conspirator who worked for the ORGANIZATION traveled to Atlanta, Georgia from approximately November 26, 2014 through November 30, 2014. Following the trip, the co-conspirator provided POLOZOV a summary of his trip's itinerary and expenses.

31.  In order to collect additional intelligence, Defendants and their co-conspirators posed as U.S. persons and contacted U.S. political and social activists. For example, starting in or around June 2016, Defendants and their co-conspirators, posing online as U.S. persons, communicated with a real U.S. person affiliated with a Texas-based grassroots organization. During the exchange, Defendants and their co-conspirators learned from the real U.S. person that they should focus their activities on "purple states like Colorado, Virginia & Florida." After that exchange, Defendants and their co-conspirators commonly referred to targeting "purple states" in directing their efforts.

Use of U.S. Social Media Platforms

32.     Defendants and their co-conspirators, through fraud and deceit, created hundreds of social media accounts and used them to develop certain fictitious U.S. personas into "leader[s] of public opinion" in the United States.

33.     ORGANIZATION employees, referred to as "specialists," were tasked to create social media accounts that appeared to be operated by U.S. persons.  The specialists were divided into day-shift and night-shift hours and instructed to make posts in accordance with the appropriate U.S. time zone.  The ORGANIZATION also circulated lists of U.S. holidays so that specialists could develop and post appropriate account activity.  Specialists were instructed to write about topics germane to the United States such as U.S. foreign policy and U.S. economic issues. Specialists were directed to create "political intensity through supporting radical groups, users dissatisfied with [the] social and economic situation and oppositional social movements."

34.     Defendants and their co-conspirators also created thematic group pages on social media sites, particularly on the social media platforms Facebook and Instagram.  ORGANIZATION-controlled pages addressed a range of issues, including: immigration (with group names including "Secured Borders"); the Black Lives Matter movement (with group names including "Blacktivist"); religion (with group names including "United Muslims of America" and "Army of Jesus"); and certain geographic regions within the United States (with group names including "South United" and "Heart of Texas").  By 2016, the size of many ORGANIZATION-controlled groups had grown to hundreds of thousands of online followers.

35.     Starting at least in or around 2015, Defendants and their co-conspirators began to purchase advertisements on online social media sites to promote ORGANIZATION-controlled social media groups, spending thousands of U.S. dollars every month.  These expenditures were included in the budgets the ORGANIZATION submitted to CONCORD.

36.     Defendants and their co-conspirators also created and controlled numerous Twitter accounts designed to appear as if U.S. persons or groups controlled them.  For example, the ORGANIZATION created and controlled the Twitter account "Tennessee GOP," which used the handle @TEN_GOP.  The @TEN_GOP account falsely claimed to be controlled by a U.S. state political party.  Over time, the @TEN_GOP account attracted more than 100,000 online followers.

37.     To measure the impact of their online social media operations, Defendants and their co-conspirators tracked the performance of content they posted over social media.  They tracked the size of the online U.S. audiences reached through posts, different types of engagement with the posts (such as likes, comments, and reposts), changes in audience size, and other metrics. Defendants and their co-conspirators received and maintained metrics reports on certain group pages and individualized posts.

38.     Defendants and their co-conspirators also regularly evaluated the content posted by specialists (sometimes referred to as "content analysis") to ensure they appeared authentic—as if operated by U.S. persons.  Specialists received feedback and directions to improve the quality of their posts.  Defendants and their co-conspirators issued or received guidance on: ratios of text, graphics, and video to use in posts; the number of accounts to operate; and the role of each account (for example, differentiating a main account from which to post information and auxiliary accounts to promote a main account through links and reposts).

<u>Use of U.S. Computer Infrastructure</u>

39.     To hide their Russian identities and ORGANIZATION affiliation, Defendants and their co-conspirators—particularly POLOZOV and the ORGANIZATION's IT department—purchased space on computer servers located inside the United States in order to set up virtual private networks ("VPNs").  Defendants and their co-conspirators connected from Russia to the U.S.-

based infrastructure by way of these VPNs and conducted activity inside the United States—including accessing online social media accounts, opening new accounts, and communicating with real U.S. persons—while masking the Russian origin and control of the activity.

40.     Defendants and their co-conspirators also registered and controlled hundreds of web-based email accounts hosted by U.S. email providers under false names so as to appear to be U.S. persons and groups.  From these accounts, Defendants and their co-conspirators registered or linked to online social media accounts in order to monitor them; posed as U.S. persons when requesting assistance from real U.S. persons; contacted media outlets in order to promote activities inside the United States; and conducted other operations, such as those set forth below.

## Use of Stolen U.S. Identities

41.     In or around 2016, Defendants and their co-conspirators also used, possessed, and transferred, without lawful authority, the social security numbers and dates of birth of real U.S. persons without those persons' knowledge or consent.  Using these means of identification, Defendants and their co-conspirators opened accounts at PayPal, a digital payment service provider; created false means of identification, including fake driver's licenses; and posted on ORGANIZATION-controlled social media accounts using the identities of these U.S. victims. Defendants and their co-conspirators also obtained, and attempted to obtain, false identification documents to use as proof of identity in connection with maintaining accounts and purchasing advertisements on social media sites.

## Actions Targeting the 2016 U.S. Presidential Election

42.     By approximately May 2014, Defendants and their co-conspirators discussed efforts to interfere in the 2016 U.S. presidential election.  Defendants and their co-conspirators began to monitor U.S. social media accounts and other sources of information about the 2016 U.S. presidential election.

43.     By 2016, Defendants and their co-conspirators used their fictitious online personas to interfere with the 2016 U.S. presidential election.  They engaged in operations primarily intended to communicate derogatory information about Hillary Clinton, to denigrate other candidates such as Ted Cruz and Marco Rubio, and to support Bernie Sanders and then-candidate Donald Trump.

    a.     On or about February 10, 2016, Defendants and their co-conspirators internally circulated an outline of themes for future content to be posted to ORGANIZATION-controlled social media accounts.  Specialists were instructed to post content that focused on "politics in the USA" and to "use any opportunity to criticize Hillary and the rest (except Sanders and Trump—we support them)."

    b.     On or about September 14, 2016, in an internal review of an ORGANIZATION-created and controlled Facebook group called "Secured Borders," the account specialist was criticized for having a "low number of posts dedicated to criticizing Hillary Clinton" and was told "it is imperative to intensify criticizing Hillary Clinton" in future posts.

44.     Certain ORGANIZATION-produced materials about the 2016 U.S. presidential election used election-related hashtags, including: "#Trump2016," "#TrumpTrain," "#MAGA," "#IWontProtectHillary," and "#Hillary4Prison."  Defendants and their co-conspirators also established additional online social media accounts dedicated to the 2016 U.S. presidential election, including the Twitter account "March for Trump" and Facebook accounts "Clinton FRAUDation" and "Trumpsters United."

45.     Defendants and their co-conspirators also used false U.S. personas to communicate with unwitting members, volunteers, and supporters of the Trump Campaign involved in local community outreach, as well as grassroots groups that supported then-candidate Trump.  These

individuals and entities at times distributed the ORGANIZATION's materials through their own accounts via retweets, reposts, and similar means. Defendants and their co-conspirators then monitored the propagation of content through such participants.

46.     In or around the latter half of 2016, Defendants and their co-conspirators, through their ORGANIZATION-controlled personas, began to encourage U.S. minority groups not to vote in the 2016 U.S. presidential election or to vote for a third-party U.S. presidential candidate.

    a.     On or about October 16, 2016, Defendants and their co-conspirators used the ORGANIZATION-controlled Instagram account "Woke Blacks" to post the following message: "[A] particular hype and hatred for Trump is misleading the people and forcing Blacks to vote Killary. We cannot resort to the lesser of two devils. Then we'd surely be better off without voting AT ALL."

    b.     On or about November 3, 2016, Defendants and their co-conspirators purchased an advertisement to promote a post on the ORGANIZATION-controlled Instagram account "Blacktivist" that read in part: "Choose peace and vote for Jill Stein. Trust me, it's not a wasted vote."

    c.     By in or around early November 2016, Defendants and their co-conspirators used the ORGANIZATION-controlled "United Muslims of America" social media accounts to post anti-vote messages such as: "American Muslims [are] boycotting elections today, most of the American Muslim voters refuse to vote for Hillary Clinton because she wants to continue the war on Muslims in the middle east and voted yes for invading Iraq."

47.     Starting in or around the summer of 2016, Defendants and their co-conspirators also began to promote allegations of voter fraud by the Democratic Party through their fictitious U.S. personas

and groups on social media.  Defendants and their co-conspirators purchased advertisements on Facebook to further promote the allegations.

    a.      On or about August 4, 2016, Defendants and their co-conspirators began purchasing advertisements that promoted a post on the ORGANIZATION-controlled Facebook account "Stop A.I."  The post alleged that "Hillary Clinton has already committed voter fraud during the Democrat Iowa Caucus."

    b.      On or about August 11, 2016, Defendants and their co-conspirators posted that allegations of voter fraud were being investigated in North Carolina on the ORGANIZATION-controlled Twitter account @TEN_GOP.

    c.      On or about November 2, 2016, Defendants and their co-conspirators used the same account to post allegations of "#VoterFraud by counting tens of thousands of ineligible mail in Hillary votes being reported in Broward County, Florida."

<u>Political Advertisements</u>

48.    From at least April 2016 through November 2016, Defendants and their co-conspirators, while concealing their Russian identities and ORGANIZATION affiliation through false personas, began to produce, purchase, and post advertisements on U.S. social media and other online sites expressly advocating for the election of then-candidate Trump or expressly opposing Clinton. Defendants and their co-conspirators did not report their expenditures to the Federal Election Commission, or register as foreign agents with the U.S. Department of Justice.

49.    To pay for the political advertisements, Defendants and their co-conspirators established various Russian bank accounts and credit cards, often registered in the names of fictitious U.S. personas created and used by the ORGANIZATION on social media.  Defendants and their co-conspirators also paid for other political advertisements using PayPal accounts.

50.    The political advertisements included the following:

| Approximate Date | Excerpt of Advertisement |
|---|---|
| April 6, 2016 | "You know, a great number of black people support us saying that #HillaryClintonIsNotMyPresident" |
| April 7, 2016 | "I say no to Hillary Clinton / I say no to manipulation" |
| April 19, 2016 | "JOIN our #HillaryClintonForPrison2016" |
| May 10, 2016 | "Donald wants to defeat terrorism . . . Hillary wants to sponsor it" |
| May 19, 2016 | "Vote Republican, vote Trump, and support the Second Amendment!" |
| May 24, 2016 | "Hillary Clinton Doesn't Deserve the Black Vote" |
| June 7, 2016 | "Trump is our only hope for a better future!" |
| June 30, 2016 | "#NeverHillary #HillaryForPrison #Hillary4Prison #HillaryForPrison2016 #Trump2016 #Trump #Trump4President" |
| July 20, 2016 | "Ohio Wants Hillary 4 Prison" |
| August 4, 2016 | "Hillary Clinton has already committed voter fraud during the Democrat Iowa Caucus." |
| August 10, 2016 | "We cannot trust Hillary to take care of our veterans!" |
| October 14, 2016 | "Among all the candidates Donald Trump is the one and only who can defend the police from terrorists." |
| October 19, 2016 | "Hillary is a Satan, and her crimes and lies had proved just how evil she is." |

Staging U.S. Political Rallies in the United States

51.    Starting in approximately June 2016, Defendants and their co-conspirators organized and coordinated political rallies in the United States.  To conceal the fact that they were based in Russia, Defendants and their co-conspirators promoted these rallies while pretending to be U.S. grassroots activists who were located in the United States but unable to meet or participate in person.

Defendants and their co-conspirators did not register as foreign agents with the U.S. Department of Justice.

52.     In order to build attendance for the rallies, Defendants and their co-conspirators promoted the events through public posts on their false U.S. persona social media accounts.  In addition, Defendants and their co-conspirators contacted administrators of large social media groups focused on U.S. politics and requested that they advertise the rallies.

53.     In or around late June 2016, Defendants and their co-conspirators used the Facebook group "United Muslims of America" to promote a rally called "Support Hillary. Save American Muslims" held on July 9, 2016 in the District of Columbia.  Defendants and their co-conspirators recruited a real U.S. person to hold a sign depicting Clinton and a quote attributed to her stating "I think Sharia Law will be a powerful new direction of freedom."  Within three weeks, on or about July 26, 2016, Defendants and their co-conspirators posted on the same Facebook page that Muslim voters were "between Hillary Clinton and a hard place."

54.     In or around June and July 2016, Defendants and their co-conspirators used the Facebook group "Being Patriotic," the Twitter account @March_for_Trump, and other ORGANIZATION accounts to organize two political rallies in New York.  The first rally was called "March for Trump" and held on June 25, 2016.  The second rally was called "Down with Hillary" and held on July 23, 2016.

     a.     In or around June through July 2016, Defendants and their co-conspirators purchased advertisements on Facebook to promote the "March for Trump" and "Down with Hillary" rallies.

     b.     Defendants and their co-conspirators used false U.S. personas to send individualized messages to real U.S. persons to request that they participate in and

help organize the rally.  To assist their efforts, Defendants and their co-conspirators, through false U.S. personas, offered money to certain U.S. persons to cover rally expenses.

c.      On or about June 5, 2016, Defendants and their co-conspirators, while posing as a U.S. grassroots activist, used the account @March_for_Trump to contact a volunteer for the Trump Campaign in New York.  The volunteer agreed to provide signs for the "March for Trump" rally.

55.      In or around late July 2016, Defendants and their co-conspirators used the Facebook group "Being Patriotic," the Twitter account @March_for_Trump, and other false U.S. personas to organize a series of coordinated rallies in Florida.  The rallies were collectively referred to as "Florida Goes Trump" and held on August 20, 2016.

a.      In or around August 2016, Defendants and their co-conspirators used false U.S. personas to communicate with Trump Campaign staff involved in local community outreach about the "Florida Goes Trump" rallies.

b.      Defendants and their co-conspirators purchased advertisements on Facebook and Instagram to promote the "Florida Goes Trump" rallies.

c.      Defendants and their co-conspirators also used false U.S. personas to contact multiple grassroots groups supporting then-candidate Trump in an unofficial capacity.  Many of these groups agreed to participate in the "Florida Goes Trump" rallies and serve as local coordinators.

d.      Defendants and their co-conspirators also used false U.S. personas to ask real U.S. persons to participate in the "Florida Goes Trump" rallies.  Defendants and their co-conspirators asked certain of these individuals to perform tasks at the rallies.

For example, Defendants and their co-conspirators asked one U.S. person to build a cage on a flatbed truck and another U.S. person to wear a costume portraying Clinton in a prison uniform. Defendants and their co-conspirators paid these individuals to complete the requests.

56.     After the rallies in Florida, Defendants and their co-conspirators used false U.S. personas to organize and coordinate U.S. political rallies supporting then-candidate Trump in New York and Pennsylvania. Defendants and their co-conspirators used the same techniques to build and promote these rallies as they had in Florida, including: buying Facebook advertisements; paying U.S. persons to participate in, or perform certain tasks at, the rallies; and communicating with real U.S. persons and grassroots organizations supporting then-candidate Trump.

57.     After the election of Donald Trump in or around November 2016, Defendants and their co-conspirators used false U.S. personas to organize and coordinate U.S. political rallies in support of then president-elect Trump, while simultaneously using other false U.S. personas to organize and coordinate U.S. political rallies protesting the results of the 2016 U.S. presidential election. For example, in or around November 2016, Defendants and their co-conspirators organized a rally in New York through one ORGANIZATION-controlled group designed to "show your support for President-Elect Donald Trump" held on or about November 12, 2016. At the same time, Defendants and their co-conspirators, through another ORGANIZATION-controlled group, organized a rally in New York called "Trump is NOT my President" held on or about November 12, 2016. Similarly, Defendants and their co-conspirators organized a rally entitled "Charlotte Against Trump" in Charlotte, North Carolina, held on or about November 19, 2016.

<u>Destruction of Evidence</u>

58.     In order to avoid detection and impede investigation by U.S. authorities of Defendants' operations, Defendants and their co-conspirators deleted and destroyed data, including emails, social media accounts, and other evidence of their activities.

a.      Beginning in or around June 2014, and continuing into June 2015, public reporting began to identify operations conducted by the ORGANIZATION in the United States.  In response, Defendants and their co-conspirators deleted email accounts used to conduct their operations.

b.      Beginning in or around September 2017, U.S. social media companies, starting with Facebook, publicly reported that they had identified Russian expenditures on their platforms to fund political and social advertisements.  Facebook's initial disclosure of the Russian purchases occurred on or about September 6, 2017, and included a statement that Facebook had "shared [its] findings with US authorities investigating these issues."

c.      Media reporting on or about the same day as Facebook's disclosure referred to Facebook working with investigators for the Special Counsel's Office of the U.S. Department of Justice, which had been charged with investigating the Russian government's efforts to interfere in the 2016 presidential election.

d.      Defendants and their co-conspirators thereafter destroyed evidence for the purpose of impeding the investigation.  On or about September 13, 2017, KAVERZINA wrote in an email to a family member:  "We had a slight crisis here at work: the FBI busted our activity (not a joke).  So, I got preoccupied with covering tracks together with the colleagues."  KAVERZINA further wrote, "I created all these pictures and posts, and the Americans believed that it was written by their people."

**Overt Acts**

59.     In furtherance of the Conspiracy and to effect its illegal object, Defendants and their co-conspirators committed the following overt acts in connection with the staging of U.S. political rallies, as well as those as set forth in paragraphs 1 through 7, 9 through 27, and 29 through 58, which are re-alleged and incorporated by reference as though fully set forth herein.

60.     On or about June 1, 2016, Defendants and their co-conspirators created and purchased Facebook advertisements for their "March for Trump" rally.

61.     On or about June 4, 2016, Defendants and their co-conspirators used allforusa@yahoo.com, the email address of a false U.S. persona, to send out press releases for the "March for Trump" rally to New York media outlets.

62.     On or about June 23, 2016, Defendants and their co-conspirators used the Facebook account registered under a false U.S. persona "Matt Skiber" to contact a real U.S. person to serve as a recruiter for the "March for Trump" rally, offering to "give you money to print posters and get a megaphone."

63.     On or about June 24, 2016, Defendants and their co-conspirators purchased advertisements on Facebook to promote the "Support Hillary. Save American Muslims" rally.

64.     On or about July 5, 2016, Defendants and their co-conspirators ordered posters for the "Support Hillary. Save American Muslims" rally, including the poster with the quote attributed to Clinton that read "I think Sharia Law will be a powerful new direction of freedom."

65.     On or about July 8, 2016, Defendants and their co-conspirators communicated with a real U.S. person about the posters they had ordered for the "Support Hillary. Save American Muslims" rally.

66.     On or about July 12, 2016, Defendants and their co-conspirators created and purchased Facebook advertisements for the "Down With Hillary" rally in New York.

67.     On or about July 23, 2016, Defendants and their co-conspirators used the email address of a false U.S. persona, joshmilton024@gmail.com, to send out press releases to over thirty media outlets promoting the "Down With Hillary" rally at Trump Tower in New York City.

68.     On or about July 28, 2016, Defendants and their co-conspirators posted a series of tweets through the false U.S. persona account @March_for_Trump stating that "[w]e're currently planning a series of rallies across the state of Florida" and seeking volunteers to assist.

69.     On or about August 2, 2016, Defendants and their co-conspirators used the false U.S. persona "Matt Skiber" Facebook account to send a private message to a real Facebook account, "Florida for Trump," set up to assist then-candidate Trump in the state of Florida.   In the first message, Defendants and their co-conspirators wrote:

> Hi there! I'm a member of Being Patriotic online community. Listen, we've got an idea. Florida is still a purple state and we need to paint it red. If we lose Florida, we lose America. We can't let it happen, right? What about organizing a YUGE pro-Trump flash mob in every Florida town? We are currently reaching out to local activists and we've got the folks who are okay to be in charge of organizing their events almost everywhere in FL. However, we still need your support. What do you think about that? Are you in?

70.     On or about August 2, 2016, and August 3, 2016, Defendants and their co-conspirators, through the use of a stolen identity of a real U.S. person, T.W., sent emails to certain grassroots groups located in Florida that stated in part:

> My name is [T.W.] and I represent a conservative patriot community named as "Being Patriotic." . . . So we're gonna organize a flash mob across Florida to support Mr. Trump. We clearly understand that the elections winner will be predestined by purple states. And we must win Florida. . . .  We got a lot of volunteers in ~25 locations and it's just the beginning. We're currently choosing venues for each

location and recruiting more activists. This is why we ask you to
spread this info and participate in the flash mob.

71.     On or about August 4, 2016, Defendants and their co-conspirators created and purchased
Facebook advertisements for the "Florida Goes Trump" rally.  The advertisements reached over
59,000 Facebook users in Florida, and over 8,300 Facebook users responded to the advertisements
by clicking on it, which routed users to the ORGANIZATION's "Being Patriotic" page.

72.     Beginning on or about August 5, 2016, Defendants and their co-conspirators used the false
U.S. persona @March_for_Trump Twitter account to recruit and later pay a real U.S. person to
wear a costume portraying Clinton in a prison uniform at a rally in West Palm Beach.

73.     Beginning on or about August 11, 2016, Defendants and their co-conspirators used the false
U.S. persona "Matt Skiber" Facebook account to recruit a real U.S. person to acquire signs and a
costume depicting Clinton in a prison uniform.

74.     On or about August 15, 2016, Defendants and their co-conspirators received an email at
one of their false U.S. persona accounts from a real U.S. person, a Florida-based political activist
identified as the "Chair for the Trump Campaign" in a particular Florida county.  The activist
identified two additional sites in Florida for possible rallies. Defendants and their co-conspirators
subsequently used their false U.S. persona accounts to communicate with the activist about
logistics and an additional rally in Florida.

75.     On or about August 16, 2016, Defendants and their co-conspirators used a false U.S.
persona Instagram account connected to the ORGANIZATION-created group "Tea Party News"
to purchase advertisements for the "Florida Goes Trump" rally.

76.     On or about August 18, 2016, the real "Florida for Trump" Facebook account responded to
the false U.S. persona "Matt Skiber" account with instructions to contact a member of the Trump
Campaign ("Campaign Official 1") involved in the campaign's Florida operations and provided

Campaign Official 1's email address at the campaign domain donaldtrump.com.   On approximately the same day, Defendants and their co-conspirators used the email address of a false U.S. persona, joshmilton024@gmail.com, to send an email to Campaign Official 1 at that donaldtrump.com email account, which read in part:

> Hello [Campaign Official 1], [w]e are organizing a state-wide event in Florida on August, 20 to support Mr. Trump.  Let us introduce ourselves first.  "Being Patriotic" is a grassroots conservative online movement trying to unite people offline. . . .  [W]e gained a huge lot of followers and decided to somehow help Mr. Trump get elected. You know, simple yelling on the Internet is not enough. There should be real action. We organized rallies in New York before. Now we're focusing on purple states such as Florida.

The email also identified thirteen "confirmed locations" in Florida for the rallies and requested the campaign provide "assistance in each location."

77.    On or about August 18, 2016, Defendants and their co-conspirators sent money via interstate wire to another real U.S. person recruited by the ORGANIZATION, using one of their false U.S. personas, to build a cage large enough to hold an actress depicting Clinton in a prison uniform.

78.    On or about August 19, 2016, a supporter of the Trump Campaign sent a message to the ORGANIZATION-controlled "March for Trump" Twitter account about a member of the Trump Campaign ("Campaign Official 2") who was involved in the campaign's Florida operations and provided Campaign Official 2's email address at the domain donaldtrump.com.  On or about the same day, Defendants and their co-conspirators used the false U.S. persona joshmilton024@gmail.com account to send an email to Campaign Official 2 at that donaldtrump.com email account.

79.    On or about August 19, 2016, the real "Florida for Trump" Facebook account sent another message to the false U.S. persona "Matt Skiber" account to contact a member of the Trump

Campaign ("Campaign Official 3") involved in the campaign's Florida operations.  On or about

August 20, 2016, Defendants and their co-conspirators used the "Matt Skiber" Facebook account

to contact Campaign Official 3.

80.     On or about August 19, 2016, Defendants and their co-conspirators used the false U.S.

persona "Matt Skiber" account to write to the real U.S. person affiliated with a Texas-based

grassroots organization who previously had advised the false persona to focus on "purple states

like Colorado, Virginia & Florida."   Defendants and their co-conspirators told that U.S. person,

"We were thinking about your recommendation to focus on purple states and this is what we're

organizing in FL."  Defendants and their co-conspirators then sent a link to the Facebook event

page for the Florida rallies and asked that person to send the information to Tea Party members in

Florida.  The real U.S. person stated that he/she would share among his/her own social media

contacts, who would pass on the information.

81.     On or about August 24, 2016, Defendants and their co-conspirators updated an internal

ORGANIZATION list of over 100 real U.S. persons contacted through ORGANIZATION-

controlled false U.S. persona accounts and tracked to monitor recruitment efforts and requests.

The list included contact information for the U.S. persons, a summary of their political views, and

activities they had been asked to perform by Defendants and their co-conspirators.

82.     On or about August 31, 2016, Defendants and their co-conspirators, using a U.S. persona,

spoke by telephone with a real U.S. person affiliated with a grassroots group in Florida.  That

individual requested assistance in organizing a rally in Miami, Florida.  On or about September 9,

2016, Defendants and their co-conspirators sent the group an interstate wire to pay for materials

needed for the Florida rally on or about September 11, 2016.

83.     On or about August 31, 2016, Defendants and their co-conspirators created and purchased Facebook advertisements for a rally they organized  and scheduled in New York for September 11, 2016.

84.     On or about September 9, 2016, Defendants and their co-conspirators, through a false U.S. persona, contacted the real U.S. person who had impersonated Clinton at the West Palm Beach rally.  Defendants and their co-conspirators sent that U.S. person money via interstate wire as an inducement to travel from Florida to New York and to dress in costume at another rally they organized.

85.     On or about September 22, 2016, Defendants and their co-conspirators created and purchased Facebook advertisements for a series of rallies they organized in Pennsylvania called "Miners for Trump" and scheduled for October 2, 2016.

    All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Conspiracy to Commit Wire Fraud and Bank Fraud)

86.     Paragraphs 1 through 7, 9 through 27, and 29 through 85 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

87.     From in or around 2016 through present, in the District of Columbia and elsewhere, Defendants INTERNET RESEARCH AGENCY LLC, DZHEYKHUN NASIMI OGLY ASLANOV, and GLEB IGOREVICH VASILCHENKO, together with others known and unknown to the Grand Jury, knowingly and intentionally conspired to commit certain offenses against the United States, to wit:

    a.      to knowingly, having devised and intending to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent

pretenses, representations, and promises, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purposes of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

b. to knowingly execute and attempt to execute a scheme and artifice to defraud a federally insured financial institution, and to obtain monies, funds, credits, assets, securities and other property from said financial institution by means of false and fraudulent pretenses, representations, and promises, all in violation of Title 18, United States Code, Section 1344.

## Object of the Conspiracy

88. The conspiracy had as its object the opening of accounts under false names at U.S. financial institutions and a digital payments company in order to receive and send money into and out of the United States to support the ORGANIZATION's operations in the United States and for self-enrichment.

## Manner and Means of the Conspiracy

89. Beginning in at least 2016, Defendants and their co-conspirators used, without lawful authority, the social security numbers, home addresses, and birth dates of real U.S. persons without their knowledge or consent. Using these means of stolen identification, Defendants and their co-conspirators opened accounts at a federally insured U.S. financial institution ("Bank 1"), including the following accounts:

| Approximate Date | Account Name | Means of Identification |
|---|---|---|
| June 16, 2016 | T.B. | Social Security Number Date of Birth |
| July 21, 2016 | A.R. | Social Security Number Date of Birth |
| July 27, 2016 | T.C. | Social Security Number Date of Birth |
| August 2, 2016 | T.W. | Social Security Number Date of Birth |

90.     Defendants and their co-conspirators also used, without lawful authority, the social security numbers, home addresses, and birth dates of real U.S. persons to open accounts at PayPal, a digital payments company, including the following accounts:

| Approximate Date | Initials of Identity Theft Victim | Means of Identification |
|---|---|---|
| June 16, 2016 | T.B. | Social Security Number Date of Birth |
| July 21, 2016 | A.R. | Social Security Number Date of Birth |
| August 2, 2016 | T.W. | Social Security Number Date of Birth |
| November 11, 2016 | J.W. | Home Address |
| January 18, 2017 | V.S. | Social Security Number |

Defendants and their co-conspirators also established other accounts at PayPal in the names of false and fictitious U.S. personas.  Some personas used to register PayPal accounts were the same as the false U.S. personas used in connection with the ORGANIZATION's social media accounts.

91.     Defendants and their co-conspirators purchased credit card and bank account numbers from online sellers for the unlawful purpose of evading security measures at PayPal, which used account numbers to verify a user's identity.  Many of the bank account numbers purchased by Defendants

and their co-conspirators were created using the stolen identities of real U.S. persons.  After purchasing the accounts, Defendants and their co-conspirators submitted these bank account numbers to PayPal.

92.     On or about the dates identified below, Defendants and their co-conspirators obtained and used the following fraudulent bank account numbers for the purpose of evading PayPal's security measures:

| Approximate Date | Card/Bank Account Number | Financial Institution | Email Used to Acquire Account Number |
|---|---|---|---|
| June 13, 2016 | xxxxxxxxx8902 | Bank 2 | wemakeweather@gmail.com |
| June 16, 2016 | xxxxxx8731 | Bank 1 | allforusa@yahoo.com |
| July 21, 2016 | xxxxxx2215 | Bank 3 | antwan_8@yahoo.com |
| August 2, 2016 | xxxxxx5707 | Bank 1 | xtimwaltersx@gmail.com |
| October 18, 2016 | xxxxxxxxx5792 | Bank 4 | unitedvetsofamerica@gmail.com |
| October 18, 2016 | xxxxxxxxx4743 | Bank 4 | patriototus@gmail.com |
| November 11, 2016 | xxxxxxxxx2427 | Bank 4 | beautifullelly@gmail.com |
| November 11, 2016 | xxxxxxxxx7587 | Bank 5 | staceyredneck@gmail.com |
| November 11, 2016 | xxxxxxxx7590 | Bank 5 | ihatecrime1@gmail.com |
| November 11, 2016 | xxxxxxxxx1780 | Bank 6 | staceyredneck@gmail.com |
| November 11, 2016 | xxxxxxxx1762 | Bank 6 | ihatecrime1@gmail.com |
| December 13, 2016 | xxxxxxxx6168 | Bank 6 | thetaylorbrooks@aol.com |
| March 30, 2017 | xxxxxxxxx6316 | Bank 3 | wokeaztec@outlook.com |
| March 30, 2017 | xxxxxx9512 | Bank 3 | wokeaztec@outlook.com |

93.     Additionally, and in order to maintain their accounts at PayPal and elsewhere, including online cryptocurrency exchanges, Defendants and their co-conspirators purchased and obtained false identification documents, including fake U.S. driver's licenses.  Some false identification documents obtained by Defendants and their co-conspirators used the stolen identities of real U.S. persons, including U.S. persons T.W. and J.W.

94.     After opening the accounts at Bank 1 and PayPal, Defendants and their co-conspirators used them to receive and send money for a variety of purposes, including to pay for certain ORGANIZATION expenses.  Some PayPal accounts were used to purchase advertisements on Facebook promoting ORGANIZATION-controlled social media accounts.  The accounts were also used to pay other ORGANIZATION-related expenses such as buttons, flags, and banners for rallies.

95.     Defendants and their co-conspirators also used the accounts to receive money from real U.S. persons in exchange for posting promotions and advertisements on the ORGANIZATION-controlled social media pages.  Defendants and their co-conspirators typically charged certain U.S. merchants and U.S. social media sites between 25 and 50 U.S. dollars per post for promotional content on their popular false U.S. persona accounts, including Being Patriotic, Defend the 2nd, and Blacktivist.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS THREE THROUGH EIGHT

### (Aggravated Identity Theft)

96.     Paragraphs 1 through 7, 9 through 27, and 29 through 85, and 89 through 95 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

97.     On or about the dates specified below, in the District of Columbia and elsewhere,

Defendants INTERNET RESEARCH AGENCY LLC, DZHEYKHUN NASIMI OGLY ASLANOV, GLEB IGOREVICH VASILCHENKO, IRINA VIKTOROVNA KAVERZINA, and VLADIMIR VENKOV did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit, wire fraud and bank fraud, knowing that the means of identification belonged to another real person:

| Count | Approximate Date | Initials of Identity Theft Victim | Means of Identification |
|-------|------------------|-----------------------------------|-------------------------|
| 3 | June 16, 2016 | T.B. | Social Security Number Date of Birth |
| 4 | July 21, 2016 | A.R. | Social Security Number Date of Birth |
| 5 | July 27, 2016 | T.C. | Social Security Number Date of Birth |
| 6 | August 2, 2016 | T.W. | Social Security Number Date of Birth |
| 7 | January 18, 2017 | V.S. | Social Security Number |
| 8 | May 19, 2017 | J.W. | Home Address Date of Birth |

All in violation of Title 18, United States Code, Sections 1028A(a)(1) and 2.

## FORFEITURE ALLEGATION

98.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to Defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2), and Title 28, United States Code, Section 2461(c), in the event of Defendants' convictions under Count Two of this Indictment.  Upon conviction of the offense charged in Count Two, Defendants INTERNET RESEARCH AGENCY LLC, DZHEYKHUN NASIMI OGLY ASLANOV, and GLEB IGOREVICH VASILCHENKO

shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction.  Upon conviction of the offenses charged in Counts Three through Eight, Defendants INTERNET RESEARCH AGENCY LLC, DZHEYKHUN NASIMI OGLY ASLANOV, GLEB IGOREVICH VASILCHENKO, IRINA VIKTOROVNA KAVERZINA, and VLADIMIR VENKOV shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to the offense(s) of conviction. Notice is further given that, upon conviction, the United States intends to seek a judgment against each Defendant for a sum of money representing the property described in this paragraph, as applicable to each Defendant (to be offset by the forfeiture of any specific property).

### **Substitute Assets**

99.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of any defendant --

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third party;

   c.     has been placed beyond the jurisdiction of the court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to Title 18, United States Code, Section

982(b) and Title 28, United States Code, Section 2461(c), incorporating Title 21, United States

Code, Section 853, to seek forfeiture of any other property of said Defendant.

(18 U.S.C. §§ 981(a)(1)(C) and 982; 28 U.S.C. § 2461(c))

Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:

_____

Foreperson

Date: February ___, 2018