**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| Plaintiff, | 1:18-cr-00032-DLF |
| v. | |
| INTERNET RESEARCH AGENCY LLC, *et al*., | |
| Defendants. | |

**DEFENDANT CONCORD MANAGEMENT AND CONSULTING LLC'S MOTION
PURSUANT TO RULE 6(e)(3)(E)(ii) FOR *IN CAMERA* INSPECTION OF LEGAL
INSTRUCTIONS PROVIDED TO THE GRAND JURY REGARDING COUNT ONE OF
THE INDICTMENT**

Pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), Defendant Concord

Management and Consulting LLC (hereinafter "Concord" or "Defendant"), by counsel,

respectfully moves for an *in camera* inspection of the legal instructions provided to the grand

jury regarding Count One of the Indictment.  For the reasons set forth below, Defendants seek

this relief in order to determine whether the instructions provided could support a motion to

dismiss Count One of the Indictment.

## I.     Introduction

The Court is well aware that heretofore investigations of alleged improper foreign

involvement in American elections have been handled by the United States Department of

Justice ("DOJ"); specifically the Campaign Finance Task Force created by former Attorney

General Reno in 1997, and where the Court worked as a prosecutor from September 1997 to

August 1998.  Former Attorney General Reno refused to bow to massive political pressure to

appoint a special counsel, and instead the Task Force methodically investigated and prosecuted

cases through 2000.[1]  Throughout all of that activity, the DOJ never brought any case like the instant Indictment, that is, an alleged conspiracy by a foreign corporation to "interfere" in a Presidential election by allegedly funding free speech.  The obvious reason for this is that no such crime exists in the federal criminal code.

Now, some twenty years later, the Deputy Attorney General acting for the recused Attorney General has rejected the history and integrity of the DOJ, and instead licensed a Special Counsel who for all practical political purposes cannot be fired, to indict a case that has absolutely nothing to do with any links or coordination between any candidate and the Russian Government.[2]  The reason is obvious, and is political: to justify his own existence the Special Counsel has to indict a Russian – any Russian.[3]  Different from any election case previously brought by the DOJ, the Special Counsel used the catch-all provision of the federal criminal code, the defraud prong of conspiracy, 18 U.S.C. § 371, to allege that a foreign corporate defendant with no presence in the United States and having never entered the United States, engaged in the make-believe crime of conspiring to "interfere" in a United States election. Indictment, Dkt. 1, ¶ 2.  Presumably to bolster these allegations (which have a strong odor of hypocrisy)[4], the Special Counsel has pleaded around the knowledge requirements of all related

---

[1]  *See* Ex. A, *Thai Businesswomen Agree to Plead Guilty to Campaign Financing Charges*, June 21, 2000, https://www.justice.gov/archive/opa/pr/2000/June/350crm.htm (listing cases brought by the Task Force).

[2]  Ex. B, *Rosenstein: "No Allegation in This Indictment That Any American Had Any Knowledge" of Russian Election Influence Operation*, Real Clear Politics, Feb. 16, 2018, https://www.realclearpolitics.com/video/2018/02/16/watch_live_deputy_ag_rod_rosenstein_announcement.html.

[3]  *See* Casablanca (1942) (Captain Renault states, "Major Strassor has been shot.  Round up the usual suspects.")

[4]  Between 1946 and 2000, the United States and its agents interfered in many global elections for the purpose of influencing foreign voters to elect candidates favorable to the United States. *See* Ex. C, *Database Tracks History of U.S. Meddling in Foreign Elections*, National Public Radio, Dec. 22, 2016, https://www.npr.org/2016/12/22/506625913/database-tracks-history-of-u-s-meddling-in-foreign-elections.  When that interference failed, on occasion the United States directed and/or participated in the removal of elected foreign leaders.  *See*, *e.g.*, Ex. D, *CIA Admits Involvement in Chile*, ABC News, Sept. 20, 2000, https://abcnews.go.com/International/story?id=82588&page=1 (describing declassified report explaining U.S. involvement in 1973 coup d'état in Chile resulting in the removal and death of democratically elected President Salvador Allende); Ex. E, *In declassified document, CIA acknowledges role in '53 Iran coup*, CNN, Aug. 19, 2013,

substantive statutes and regulations by asserting that Concord conspired to obstruct the functions of the United States Departments of Justice ("DOJ") and State ("DOS"), and the Federal Election Commission ("FEC").[5]  But violations of the relevant federal campaign laws and foreign agent registration requirements administered by the DOJ and the FEC require the defendant to have acted "willfully," a word that does not appear anywhere in Count One of the Indictment.  *See* 52 U.S.C. §  30109(d) and 22 U.S.C. §  618(a).[6]

This sleight-of-hand does not relieve the Special Counsel from the requirement that the indictment contain all of the elements of the offense charged.  *See Russell v. United States*, 369 U.S. 749, 763 (1962).  As such, Count One of the Indictment appears to be facially invalid because it fails to charge an essential element of the offense of conspiracy to defraud the United States by impairing, obstructing and defeating the functions of the FEC and the DOJ, that is, that the Defendant acted willfully, in this case meaning that Defendant was aware of the FEC and FARA requirements, agreed to violate those requirements, and ultimately acted with intent to violate those requirements.  *See United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004) (dismissing indictment that tracked only part of the statutory language).  The absence of the word "willfully" in Count One of the Indictment establishes that Defendant has a particularized need to obtain the limited relief sought, that is, an *in camera* inspection of the legal instructions the Special Counsel provided to the grand jury.  With that information, the Court can determine

---

https://www.cnn.com/2013/08/19/politics/cia-iran-1953-coup/index.html  (explaining  U.S.  involvement  in  coup d'état in Iran resulting in the removal of democratically elected Prime Minister Mohammad Mosaddegh).

[5] Count One of the Indictment is devoid of any specificity about what any officer or employee of Concord actually did other than to generally allege that Concord funded an "Organization" that the Special Counsel imagined and created.  *See* Indictment at ¶¶ 2, 3.  It is not clear whether the Indictment alleges that Concord was part of the "Organization."  *See* Indictment ¶ 2.

[6] To make matters worse, the Special Counsel omitted from Count One any citation to any federal campaign or registration statute or regulations, leaving a foreign corporation with no knowledge of these complex and arcane provisions to figure it out.  *See* Indictment ¶¶ 7, 9, 25, 26.

whether those instructions could support a motion to dismiss the facially invalid Count One of the Indictment.

## II.  Statement of Facts

Defendant Concord is charged in a single count with knowingly and intentionally conspiring to defraud the United States " . . . by impairing, obstructing and defeating the lawful functions of the Federal Election Commission, the U.S. Department of Justice and the U.S. Department of State in administering federal requirements for disclosure of foreign involvement in certain domestic activities."  Indictment ¶ 9.  The Indictment asserts that the lawful functions involved were: (1) the FEC's authority to require certain disclosures, (2) the DOJ's authority to require certain persons to register as foreign agents, and (3) the DOS's authority over issuance of travel visas.  *See id*. ¶¶ 7, 9 and 25-28.  The *mens rea* alleged in Count One is "knowingly and intentionally."  *Id*. ¶ 9.

## III.  Statement of the Law and Argument

### A.  Disclosure of Grand Jury Materials

To obtain disclosure of grand jury materials a defendant must show a particularized need; specifically, that the material is needed to avoid possible injustice in a judicial proceeding, the need to disclose outweighs the need for continued secrecy, and the request is structured to cover only what is needed.  *See United States v. Proctor & Gamble*, 356 U.S. 677, 682-83 (1958). With regard to legal instructions provided to the grand jury, the Defendant must identify facts which raise doubts to the accuracy of the instructions.  *See United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (". . . where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." (quoting *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991)).

4

A court may authorize disclosure of a grand jury matter at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury.  *See* Fed. R. Crim. P. 6(e)(3)(E)(ii).  *See also United States v. Naegele*, 367 B.R. 15, 17 (D.D.C. 2007) (finding a particularized need for *in camera* inspection of grand jury transcripts).  *But see United States v. Singhal*, 876 F. Supp. 2d 82, 98-99 (D.D.C. 2012); *United States v. Espy*, 23 F. Supp. 2d 1, 10 (D.D.C. 1998); and *United States v. Trie*, 23 F. Supp. 2d 55, 62 (D.D.C. 1998) (finding no particularized need for disclosure of grand jury instructions where the indictment is facially valid).

### B.     *Mens Rea* Requirement for Violation of Count One[7]

As best as the Defendant can determine from Count One of the Indictment, the Special Counsel appears, at least in part, to believe that the Defendant either failed to disclose or caused the failure to disclose funding for certain electioneering communications to the FEC as required by 52 U.S.C. § 30104(f).[8]  *See* Indictment ¶¶ 7, 11.  A violation of this statute requires that the defendants acted "knowingly and willfully."  *See* 52 U.S.C. § 30109(d).  The Department of Justice has stated unequivocally that in using 18 U.S.C. § 371 to allege a conspiracy to defraud the FEC, the government must prove that: (1) the defendant was aware that his or her conduct was generally unlawful, and (2) that the defendant intended to disrupt and impede the lawful functioning of the FEC.  *See* Dep't of Justice, *Federal Prosecution of Election Offenses* 162-163 (December 2017), https://www.justice.gov/criminal/file/1029066/download.  The Department of Justice conceded that this is arguably an even a higher burden than the "knowingly and willfully" mental state required by Section 30109(d) itself.  *Id*.  *See also Bluman v. Federal Election*

---

[7] Defendant intends to fully brief this issue in its motion to dismiss the Indictment.

[8] There is a serious question about whether the provisions contained in 52 U.S.C. § 30104(f) applied to Concord in this case.  That question will be addressed in a motion to dismiss the Indictment.

*Commission*, 800 F. Supp. 2d 281, 292 (D.D.C. 2011) (three judge panel of the district court warning the Department of Justice that seeking criminal penalties against foreign nationals for making certain prohibited campaign expenditures will require proof of the defendant's knowledge of the law); Ex. F, Indictment at ¶ 10, *United States v. Hsia*, No. 98-cr-0057 (D.D.C. Feb. 18, 1998) (charging that defendant acted "knowingly and willfully" in conspiring to defraud the FEC).[9]  *See also United States v. Curran*, 20 F.3d 560, 571 (3d Cir. 1994) (in a case involving conspiracy to defraud the Federal Election Commission, finding an instruction that contained the word "willfully" to be deficient and requiring a jury instruction that the jury must find defendant agreed to commit an unlawful act combined with intent to commit the underlying offense).

The same burden exists under the Foreign Agents Registration Act to prove willfulness. *See* 22 U.S.C. § 618(a); Dep't of Justice, FARA Enforcement, www.justice.gov/nsd-fara/fara-enforcement.[10]

### C.    The Indictment Fails to Allege Defendant Acted "Willfully," and As Such *In Camera* Inspection is Necessary and Proper

All criminal defendants have a Fifth Amendment right to be tried on an indictment by a grand jury.  *See United States v. Hillie*, 227 F. Supp. 3d 57, 77-78 (D.D.C. 2017).  While there is case law to support the argument that some Section 371 conspiracies to defraud do not require proof of the *mens rea* required for related substantive offenses, *see, e.g., United States v. Childress*, 58 F.3d 693, 708 (D.C. Cir. 1995), the law relating to such conspiracies which are

---

[9] In *United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010), Circuit Judge Kavanaugh in his concurring opinion noted that Supreme Court case law is clear that statutes prohibiting some regulatory offenses require proof that the defendant was aware that the conduct was unlawful.

[10] There is also serious doubt about whether FARA applied to Concord, and whether the Special Counsel is claiming that Concord was required to register as a foreign agent.  The same is true with respect to the allegations about obtaining visas through false and fraudulent statements.  Those questions will also be addressed in a subsequent motion to dismiss.

based on complex regulatory offenses allows less leeway.  *See* Section III.B above.  The instant Indictment fails to allege that the Defendant knew it was acting unlawfully and that it intended to violate the underlying regulatory offenses.

The risk here is acute, that is, a foreign corporation with no presence in the United States is indicted in an unprecedented case of a type never before brought by the DOJ for conspiring to defraud the United States purportedly by not complying with certain regulatory requirements that are unknown even to most Americans.   Under these limited circumstances the Court should conduct an *in camera* review of the legal instructions provided to the grand jury to determine whether or not they include information that would support a motion to dismiss the indictment.  *See United States v. Hoey*, No. 11-cr-337, 2014 WL 2998523, at *3 (S.D.N.Y. July 2, 2014) (granting motion for *in camera* review of grand jury legal instructions where defendant "has come forward with more than mere speculation that the grand jury did not receive the proper instructions" on the causation element that would trigger a mandatory minimum sentence).  *See also Stevens*, 771 F. Supp. 2d at 566-68 (dismissing indictment where the government "seriously misstate[d] the applicable law" to the grand jury); *United States v. Bowling*, 108 F. Supp. 3d 343, 352-53 (E.D.N.C. 2015) (concluding that "the government's erroneous legal instruction to the grand jury concerning the Procurement Integrity Act played a significant and impermissible role in the grand jury's decision to indict defendants…").

## IV.   The Proposed Relief[11]

Defendant Concord is seeking the narrowest of relief, simply that the Court conduct an *in camera* inspection of the legal instruction the Special Counsel provided to the grand jury with respect to Count One of the Indictment.  If the Court determines that the Special Counsel did not

---

[11] Nothing in this filing should be construed as an admission that Concord committed any of the alleged activities.

provide a complete and accurate *mens rea* instruction then the instruction should be disclosed to the Defendant because there may be grounds to dismiss Count One of the Indictment on that basis.

**V.     The Special Counsel's Position on Defendant's Motion is Unknown**

The Special Counsel has not responded to undersigned counsel's April 19, 2018 request for its position regarding Defendant's instant motion.

Dated:  May 14, 2018

Respectfully submitted,

CONCORD MANAGEMENT AND
CONSULTING, LLC

By Counsel

/s/*Eric A. Dubelier*

Eric A. Dubelier
Katherine Seikaly
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
edubelier@reedsmith.com
kseikaly@reedsmith.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 14th day of May 2018, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) all counsel of record registered with the CM/ECF system.

/s/   *Katherine J. Seikaly*
Katherine J. Seikaly
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005
202-414-9200 (phone)
202-414-9299 (fax)
kseikaly@reedsmith.com

*Counsel for Concord Management and Consulting LLC*

# EXHIBIT A



FOR IMMEDIATE RELEASE

CRM

WEDNESDAY, JUNE 21, 2000

(202) 616-2777

WWW.USDOJ.GOV

TDD (202) 514-1888

## THAI BUSINESSWOMEN AGREE TO PLEAD GUILTY

### TO CAMPAIGN FINANCING CHARGES

WASHINGTON, D.C. -- Pauline Kanchanalak, a Thai national, and Duangnet
Kronenberg today agreed to plead guilty to campaign financing-related
offenses and to cooperate in the Justice Department's ongoing
investigation, the Campaign Financing Task Force announced. Kanchanalak
and Kronenberg will enter their guilty pleas before the U.S. District
Judge Paul L. Friedman in Washington D.C. at 2:00 p.m. on Friday, June
23, 2000. The two are among 25 people charged by the Campaign Financing
Task Force, which was established four years ago by Attorney Janet Reno
to investigate allegations of campaign financing abuses in the 1996
election cycle.

In a plea agreement, filed today in U.S. District Court in Washington,
D.C., Kanchanalak agreed to plead guilty to a 2-count criminal
Superseding Information, which also was filed with the court today.
Count One of the Information charges Kanchanalak with participating in a
conspiracy to cause false statements to be made to the Federal Election
Commission from 1992-1996. According to the Information, she conspired
to use foreign funds to make prohibited federal and non-federal
political contributions to the Democratic National Committee and other
campaign committees. She further conspired to have those committees
report the illegal contributions to the FEC without the true source of
the illegal contributions being detected by the FEC.

According to the plea documents, Kanchanalak caused more than $690,000
in foreign money to be contributed to the DNC and other political
committees between 1992 and 1996. All of the illegal contributions were
made on checks drawn on the accounts of Duangnet Kronenberg and Praitun
Kanchanalak, who is Duangnet Kronenberg's mother and Pauline
Kanchanalak's mother-in-law. A portion of the funds that were used to
make the illegal contributions were provided to Kronenberg and Praitun
Kanchanalak by Ban Chang International (USA), Inc. (BCI), a Cayman
Islands corporation of which Pauline Kanchanalak was President. Duangnet
Kronenberg also was an officer of BCI.

According to the Superseding Information, Kanchanalak engaged in the conspiracy in order to gain favor with the DNC, and thereby to gain attendance to fundraising and political events with President Clinton, members of his Administration, and prominent members of the business community. Kanchanalak and her coconspirators believed this would help develop business and networking opportunities for Kanchanalak and BCI's clients. More than $457,000 of the illegal contributions caused by Pauline Kanchanalak were provided to the DNC and five state Democratic party committees in connection with a "coffee" held at the White House on June 18, 1996. The coffee was attended by, among others, President Clinton, Pauline Kanchanalak, John Huang, and two executives of Charoen Pokphand Group (also known as the CP Group), a Thai corporation.

Count Two of the Superseding Information charges Pauline Kanchanalak with causing BCI to make an illegal $20,000 corporate contribution to the DNC's federal account in May 1994, in criminal violation of the Federal Election Campaign Act ("FECA").

Kanchanalak faces maximum penalties of six years of imprisonment and a fine of $350,000.

Duangnet Kronenberg has agreed to plead guilty to a one-count criminal Superseding Information charging her with causing BCI to make an illegal $10,000 corporate contribution to the DNC's federal account in February 1996, in criminal violation of the FECA. Kronenberg faces a maximum penalty of one year of imprisonment and a fine of $100,000.

In July 1998, Kanchanalak and Kronenberg were indicted on charges connected to the conduct to which they have now agreed to plead guilty. In December 1998 and February 1999, Judge Friedman dismissed various counts in the pending indictment against the two, but the Task Force appealed Judge Friedman's decisions, and obtained a reversal of those rulings in the D.C. Circuit Court of Appeals. All of the dismissed counts were reinstated by the D.C. Circuit, which held, among other things, that, under current law, foreign nationals may not contribute either federal ("hard") or non-federal ("soft") money to campaign committees in the United States.

After the appellate decision was rendered, the court ultimately rescheduled the trial for November 13, 2000. In exchange for their guilty pleas, the Task Force has agreed to dismiss the pending indictment at the time of Kanchanalak's and Kronenberg's sentencings.

In addition to Pauline Kanchanalak and Duangnet Kronenberg, the Task Force has prosecuted 23 other individuals.

On June 6, 2000, Audrey Yu, an employee of David Chang, pled guilty in U.S. District Court in Newark, N.J., to conspiring to obstruct justice by providing a false document to a federal district court during the grand jury's investigation into campaign financing violations in New Jersey.

On June 2, 2000, David Chang pled guilty to charges that as a principal of Nikko Enterprises, Bright & Bright Corporation, Panacom Inc., and Hudson Terrace Realty Management Corporation, he conspired to funnel illegal campaign contributions to Senator Robert Torricelli's 1996 campaign. Chang also pled guilty to four substantive violations of the FECA for his role in funneling illegal campaign contributions in others names. Chang further pled guilty to corruptly attempting to persuade a potential grand jury witness to give false statements related to a financial transaction which was material to the grand jury

investigation. Chang's sentencing date has been set for September 7, 2000.

On June 1, 2000, Cha-Kuek Koo, a Korean national residing in New Jersey, pled guilty to violating federal election law by making illegal contributions to Senator Torricelli's campaign. Koo admitted to assisting David Chang in making conduit contributions using Koo's employees at LG Group, Executive Office of the Americas. Koo's sentencing has also been set for September 7, 2000.

On April 5, 2000, a federal grand jury indicted two Buddhist nuns, Venerables Yi Chu and Man Ho, with contempt of court for failing to appear as witnesses in the government's criminal trial against Maria Hsia. Yi Chu and Man Ho remain fugitives.

On March 2, 2000, Maria Hsia was convicted in federal district court in Washington, D.C., on charges of causing false statements to be submitted to the FEC. The trial had been postponed pending an appeal of a ruling by the U.S. District Court in Washington, D.C., which had dismissed some of the false statement counts. In May 1999, the U.S. Court of Appeals in Washington, D.C. overturned the ruling and reinstated those counts. The task force dismissed a second indictment on tax charges after a jury in Los Angeles failed to reach a verdict. Hsia awaits sentencing in September.

On December 17, 1999, Yogesh Gandhi was sentenced to one year in prison for mail fraud, tax evasion, and violating federal election laws by aiding and abetting the making of a political campaign contribution by a foreign national.

On November 1, 1999, Yah Lin "Charlie" Trie, a Little Rock, Arkansas businessman, was sentenced, after pleading guilty, to a two-count information filed in Little Rock, Arkansas, to three years probation, four months home detention, 200 hours of community service, and a $5,000 fine for violating federal campaign finance laws by making political contributions in someone else's name and by causing a false statement to be made the FEC. Antonio Pan was also indicted with Trie in the District of Columbia, but has not yet been prosecuted because he has remained outside the United States.

On September 15, 1999, Lawrence Penna, the former President of a now-defunct New Jersey securities firm, was charged with violating election laws by funneling illegal campaign contributions to the 1996 federal election campaigns of President Clinton and Senator Torricelli. Penna's case was transferred by agreement to the Southern District of New York, where charges relating to his violation of United States' securities laws were pending.

On August 16, 1999, a federal judge sentenced Robert S. Lee to three years of probation and 250 hours of community service for aiding and abetting the making of an illegal foreign campaign contribution to the Democratic National Committee.

On August 12, 1999, former Lippo Executive John Huang pleaded guilty to a felony charge, filed in U.S. District Court in Los Angeles, that he conspired with other employees of the Indonesia-based Lippo Group to make campaign contributions and reimburse employees with corporate funds or with funds from Indonesia. He was sentenced to one year of probation, 500 hours of community service, a $10,000 fine and directed by the judge to continue cooperating with the investigation as a condition of his probation.

In June 1999, Berek Don, former GOP party leader in Bergen County, NJ, pled guilty to another conduit contribution scheme to the Senator Torricelli Campaign. Don awaits sentencing. On December 1, 1999, Carmine Alampi, a Bergen County New Jersey attorney, pleaded guilty to the same scheme. He awaits sentencing.

On March 23, 1999, Juan C. Ortiz, the Chief Financial Officer of Future Tech International, Inc., was sentenced to two years probation, $20,000 in fines, and 200 hours in community service for acting as a conduit for an illegal campaign contribution and participating in the reimbursement of eight other conduit contributions.

On December 14, 1998, Johnny Chung was sentenced to probation and 3,000 hours of community service for bank fraud, tax evasion and two misdemeanor counts of conspiring to violate election law.

On November 24, 1998, Howard Glicken, a fund-raiser for the Democratic party, was sentenced to 18 months probation, an $80,000 fine, and ordered to perform 500 hours of community service for violating campaign finance laws.

On November 4, 1998, Franklin Haney was indicted on more than 40 counts, including among others, conspiring with another to defraud the United States by impairing and impeding the FEC and conspiring to violate specific provisions of federal election law. He was acquitted of all charges on June 30, 1999.

On September 30, 1998, Democratic fund-raiser Mark B. Jimenez was indicted in Washington, D.C. on 17 counts of organizing, making and concealing illegal conduit contributions to a number of Democratic campaigns, including the Torricelli Campaign. In December 1998, Future Tech International, Jimenez's Miami based computer sales company, pleaded guilty to tax offenses resulting from its illegal deduction of a $100,000 contribution to the DNC and employee campaign contributions reimbursed through the company's payroll. On April, 15, 1999, Jimenez, who is now in the Philippines, was indicted in Miami on additional charges of tax evasion and fraud. The task force is pursuing Jimenez's extradition from the Philippines.

In 1997, the Task Force obtained guilty pleas from Democratic fund-raisers Nora and Gene Lum, and their daughter Trisha, and Michael Brown for illegal fund-raising activities after their cases were referred from Independent Counsel Daniel Pearson. In August 1998, Gene Lum pleaded guilty to filing a false 1994 tax return and falsely preparing Nora Lum's 1994 tax return. After cooperating with the government, he was sentenced in June 1999, to two years in prison. Nora Lum was sentenced to 5 months in a halfway house, 5 months in home detention, and ordered to pay a $30,000 fine, a sentence which Gene Lum also served separate and apart from the sentence he received for his tax-related conviction. Trisha Lum and Michael Brown each received probation, a $5,000 fine, costs of more than $7,000, and were ordered to perform 150 hours of community service.

###

00-350

# EXHIBIT B



# Rosenstein: "No Allegation in This Indictment That Any American Had Any Knowledge" Of Russian Election Influence Operation

Posted By Tim Hains
On Date February 16, 2018

WATCH: Deputy AG Rosenstein discusses indictment of Russians for 2016...

[▶]

Deputy Attorney General Rod Rosenstein held a brief press conference Friday to explain details in the indictment of 13 Russians over alleged election interference. Rosenstein said that no Americans had any knowledge of the operation listed in this indictment and that the operation had no impact on the outcome of the election.

ROD ROSENSTEIN: The indictment charges 13 Russian nationals and three Russian companies for committing federal crimes while seeking to interfere in the United States political system, including the 2016 presidential election.

The defendants allegedly conducted what they called information warfare against the United States, with the stated goal of spreading distrust towards the candidates and the political system in general.

According to the allegations in the indictment, 12 of the individual defendants worked, at various times, for a company called Internet Research Agency, LLC, a Russian company based in St. Petersburg.

The other individual defendant, Yevgeny Viktorovich Prigozhin, funded the conspiracy through companies known as Concord Management and Consulting, LLC; Concord Catering; and many affiliates and subsidiaries. The conspiracy was part of a larger operation called Project Lakhta. Project Lakhta included multiple components, some involving domestic audiences within the Russian Federation, and others targeting foreign audiences in multiple countries.

Internet Research Agency allegedly operated through Russian shell companies. It employed hundreds of people in its online operations, ranging from creators of fictitious personas, to technical and administrative support personnel, with an annual budget of millions of dollars.

Internet Research Agency was a structured organization headed by a management group and arranged into departments, including graphics, search engine optimization, information technology and finance departments.

In 2014, the company established a translator project focused on the United States. In July of 2016, more than 80 employees were assigned to the translator project. Two of the defendants allegedly traveled to the United States in 2014 to collect intelligence for their American influence operations.

In order to hide the Russian origins of their activities, the departments allegedly purchased space on computer servers located here in the United States in order to set up a virtual private network. The defendants allegedly used that infrastructure to establish hundreds of accounts on social media networks such as Facebook, Instagram and Twitter, making it appear that those accounts were controlled by persons located in the United States.

They used stolen or fictitious American identities, fraudulent bank accounts and false identification documents. The defendants posed as politically and socially active Americans, advocating for and against particular candidates. They established social media pages and groups to communicate with unwitting Americans. They also purchased political advertisements on social media networks.

The Russians also recruited and paid real Americans to engage in political activities, promote political campaigns and stage political rallies. The defendants and their co-conspirators pretended to be

grassroots activists. According to the indictment, the Americans did not know that they were communicating with Russians.

After the election, the defendants allegedly staged rallies to support the president-elect, while simultaneously staging rallies to protest his election. For example, the defendants organized one rally to support the president-elect and another rally to oppose him, both in New York, on the same day.

On September 13th of 2017, soon after the news media reported that the special counsel's office was investigating evidence that Russian operatives had used social media to interfere with the 2016 election, one defendant allegedly wrote, quote, "We had a slight crisis here at work. The FBI busted our activity. So I got preoccupied with covering tracks together with my colleagues," end quote.

The indictment includes eight criminal counts. Count one alleges a criminal conspiracy to defraud the United States by all of the defendants. The defendants allegedly conspired to defraud America by impairing the lawful functions of the Federal Election Commission, the United States Department of Justice and the Department of State.

Those organizations of the U.S. government are responsible for administering federal requirements for disclosure of foreign involvement in certain domestic activities.

Count two charges conspiracy to commit wire fraud and bank fraud by Internet Research Agency and two of the individual defendants. And counts three through eight charge aggravated identity theft by

Internet Research Agency and four individuals.

Now, there is no allegation in this indictment that any American was a knowing participant in this illegal activity. There is no allegation in the indictment that the charged conduct altered the outcome of the 2016 election.

I want to caution you that everyone changed with a crime is presumed innocent unless and until proven guilty in court. At trial, prosecutors must introduce credible evidence that is sufficient to prove each defendant guilty beyond any reasonable doubt to a unanimous jury. The special counsel's investigation is ongoing. There will be no comments from the special counsel at this time.

This indictment serves as a reminder that people are not always who they appear to be on the internet. The indictment alleges that the Russian conspirators want to promote discord in the United States and undermine public confidence in democracy. We must not allow them to succeed.

The Department of Justice will continue to work cooperatively with other law enforcement and intelligence agencies and with the Congress to defend our nation against similar current and future efforts.

I want to thank the federal agents and prosecutors who are working on this case for their exceptional service, and I'll be happy to take a few questions.

QUESTION: Jack, is there concern that this -- the (ph) indictment

undermines the outcome of the election?

ROSENSTEIN: Well, haven't I (ph) identified for you the allegations in the indictment? There's no allegation in the indictment of any effect on the outcome of the election.

Jessica.

QUESTION: On page 4 of the indictment, paragraph 6, it specifically talks about the Trump campaign, saying that defendants communicated with unwitting individuals associated with the Trump campaign.

My question is, later in the indictment, campaign officials are referenced, not by their name; by "campaign official 1" or "2" or "3." Were campaign officials cooperative, or were they duped? What is their relationship with this?

ROSENSTEIN: Again, there's no allegation in this indictment that any American had any knowledge. And the nature of the scheme was the defendants took extraordinary steps to make it appear that they were ordinary American political activists, even going so far as to base their activities on a virtual private network here in the United States so, if anybody traced it back to that first jump, they appeared to be Americans.

Catherine?

STAFF: We'll take one more question.

QUESTION: Have you had any assurances from the Russians that they will provide these individuals for prosecution?

ROSENSTEIN: There's been no communication with the Russians about this. We'll follow the ordinary process of seeking cooperation and extradition. Thank you very much.

# EXHIBIT C

POLITICS

# Database Tracks History Of U.S. Meddling In Foreign Elections

Listen · 3:34     ( Queue )     Download Transcript

December 22, 2016 · 4:28 PM ET
Heard on All Things Considered

NPR's Ari Shapiro talks to Carnegie Mellon University researcher Dov Levin about his historical database that tracks U.S. involvement in meddling with foreign elections over the years.

ARI SHAPIRO, HOST:

This is hardly the first time a country has tried to influence the outcome of another country's election. The U.S. has done it, too, by one expert's count, more than 80 times worldwide between 1946 and 2000. That expert is Dov Levin of Carnegie Mellon University. I asked him to tell me about one election where U.S. intervention likely made a difference in the outcome.

DOV LEVIN: One example of that was our intervention in Serbia, Yugoslavia in the 2000 election there. Slobodan Milosevic was running for re-election, and we didn't want him to stay in power there due to his tendency, you know, to disrupts the Balkans and his human rights violations.

So we intervened in various ways for the opposition candidate, Vojislav Kostunica. And we gave funding to the opposition, and we gave them training and campaigning aide. And according to my estimate, that assistance was crucial in enabling the opposition to win.

SHAPIRO: How often are these interventions public versus covert?

LEVIN: Well, it's - basically there's about - one-third of them are public, and two-third of them are covert. In other words, they're not known to the voters in the target before the election.

SHAPIRO: Your count does not include coups, attempts at regime change. It sounds like depending on the definitions, the tally could actually be much higher.

LEVIN: Well, you're right. I don't count and discount covert coup d'etats like the United States did in Iran in 1953 or in Guatemala in 1954. I only took when the United States is trying directly to influence an election for one of the sides. Other types of interventions - I don't discuss. But if we would include those, then of course the number could be larger, yeah.

SHAPIRO: How often do other countries like Russia, for example, try to alter the outcome of elections as compared to the United States?

LEVIN: Well, for my dataset, the United States is the most common user of this technique. Russia or the Soviet Union since 1945 has used it half as much. My estimate has been 36 cases between 1946 to 2000. We know also that the Chinese have used this technique and the Venezuelans when the late Hugo Chavez was still in power in Venezuela and other countries.

SHAPIRO: The U.S. is arguably more vocal than any other country about trying to promote democracy and democratic values around the world. Does this strike you as conflicting with that message?

LEVIN: It depends upon if we are assisting pro-democratic side - could be like in the case of Slobodan Milosevic that I talked about earlier. I believe that that could be helpful for democracy. If it helps less-nicer candidates or parties, then naturally it can be less helpful.

SHAPIRO: Obviously your examination of 20th century attempts to influence elections does not involve hacking because computers were not widespread until recently.

LEVIN: Yeah.

SHAPIRO: In your view, is technology - the way that we saw in the November election - dramatically changing the game? Or is this just the latest evolution of an effort that has always used whatever tools are available?

LEVIN: I would say it's more the latter. I mean the Russians or the Soviets before unfrequently did these type of intervention, just, you know, without the cyber-hacking tools - you know, the old style people meeting in the park in secret giving out and getting information and things like that, so to speak.

SHAPIRO: Dov Levin is with the Institute for Politics and Strategy at Carnegie Mellon University. Thanks for joining us.

LEVIN: Thank you very much.

*Copyright © 2016 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# EXHIBIT D

 NEWS     VIDEO     LIVE     SHOWS     ⋮⋮⋮     🔍

# CIA Admits Involvement in Chile

By **DAVID BRISCOE**   W A S H I N G T O N, Sept. 20

The CIA is acknowledging for the first time the extent of its deep involvement in Chile, where it dealt with coup-plotters, false propagandists and assassins.

The agency planned to post a declassified report required by Congress on its Web site today that admits CIA support for the 1970 kidnapping of Chile's top general for refusing to use the Army to prevent the country's congress from confirming the election of socialist Salvador Allende as president. The kidnapping failed, but Gen. Rene Schneider was shot and died two days later, the day Allende's election was confirmed.

The CIA admits prior knowledge of the plot that overthrew Allende three years later but denies direct involvement. The report says the agency had no idea that Allende would refuse safe passage with his palace under bombardment and apparently kill himself. He was found dead of gunshot wounds.

There is no evidence the CIA wanted Schneider killed for refusing to join the coup attempt in 1970, the report said, although the agency later paid $35,000 to the group that botched his capture.

CIA Payment to Secret Police Chief

The report also disclosed a CIA payment to Gen. Manuel Contreras Sepulveda, head of the Chilean secret police, whom it knew to be involved in post-Allende human rights abuses. In 1993, Contreras was sentenced to prison for a rare act of foreign-sponsored terrorism on American soil — the 1976 car-bomb killing of a Chilean diplomat and an American associate on Embassy Row in Washington.

The report does not reveal how much Contreras received in a one-time payment for his CIA services and says the payment was made by mistake after it had been overruled by high officials. The report says, however, that the CIA had contact with Contreras on several occasions before and after the bombing.

Payment to remnants of the group that kidnapped Schneider was made for "humanitarian reasons," to maintain their good will and to avoid disclosure of prior CIA contacts, the report said. It said in those contacts the agency withheld support for the Schneider kidnapping, because agents believed the group could not pull it off.

The report also describes efforts to influence news media in Chile against Allende and to augment anti-leftist propaganda activities by the coup-maker who toppled and succeeded Allende, Augusto Pinochet.

It spoke of CIA activities "including support for news media committed to creating a positive image for the military junta," which is now accused of an array of abuses during Pinochet's 17-year rule including more than 3,000 killings.

Civilians collaborating with the CIA, but not acting on CIA direction, produced the "White Book" intended to justify Allende's overthrow with allegations of plans to murder the high command in the months before the coup, the report said. It said the CIA knew at the time this was "probably disinformation."

CIA Denies Human Rights Abuses

Despite the disclosures, the CIA report admits to no abuses or cover-ups by CIA agents.

"A review of CIA's files has uncovered no evidence that CIA officers and employees were engaged in human rights abuses or in covering up any human rights abuses in Chile," the report says.

But it chronicles clandestine contacts authorized by President Nixon and other top U.S. officials that it said would violate standards now followed by the agency.

The agency now carefully reviews all contacts for potential involvement with human rights abuses, the report said. It "makes a deliberate decision balancing the nature and severity of the human rights abuse against the potential intelligence value of continuing the relationship."

Rep. Maurice Hinchey, D-N.Y., who sponsored the law that required the report, said he takes the CIA at its word on today's standards. But he pushed for full disclosure of past acts to prevent U.S. support for such injustices in the future.

"I think the environment has changed, and I'm prepared to believe the agency has changed," Hinchey said in an interview. "I think that in today's atmosphere, this would not happen. That does not mean it would not happen in tomorrow's atmosphere."

Nixon Worried About Allende

The CIA report points to the worries of Nixon and other top U.S. officials about Allende's leftist ties and their fears of rising Soviet influence in Latin America.

"This very sordid chapter in American history needs to be held up to the bright light so that everyone can see what went on under orders from the president of the United States, the secretary of state and the attorney general," Hinchey said.

CIA spokeswoman Anya Guilsher said the report addresses key questions Congress has had concerning CIA activities in Chile in both the 1970 coup planning and the 1973 coup.

"We were aware of coup plotting in 1973, but we did not instigate it," she said.

More CIA files and other documents on Chile are to be released in a few weeks.

White House spokesman Joe Lockhart said last week that release of the documents on human rights abuse and terrorism during the regime of Allende successor Gen. Augusto Pinochet was delayed by Sandy Berger, president Clinton's national security adviser, to review more documents.

"Basically, we want to make sure we get this done right, and we are as responsive as we are able to, as far as the fullest-possible disclosure of documents," Lockhart said.

# EXHIBIT E

# In declassified document, CIA acknowledges role in '53 Iran coup

By Dan Merica and Jason Hanna, CNN

Updated 11:16 PM ET, Mon August 19, 2013



**PHOTOS:** Photos: Iran's 1953 coup

1 of 7

### STORY HIGHLIGHTS

A newly declassified document acknowledges the CIA's hand in ousting Mohammad Mossadegh

Sixty years after the overthrow of Iranian Prime Minister Mohammad Mossadegh, a declassified CIA document acknowledges that the agency was involved in the 1953 coup.

The independent National Security Archive research institute, which published the document Monday,

While this might be the CIA's first formal nod, the U.S. role has long been known

The CIA used propaganda, along with other politicians and leaders in Iran, to unseat Mossadegh

Even 60 years removed, the 1953 coup still hangs over U.S.-Iran relations.

says the declassification is believed to mark the CIA's first formal acknowledgment of its involvement.

The documents, declassified in 2011 and given to George Washington University research group under the Freedom of Information Act, come from the CIA's internal history of Iran from the mid-1970s and paint a detailed picture of how the CIA worked to oust Mossadegh.

In a key line pointed out by Malcom Byrne, the editor who worked through the documents, the CIA spells out its involvement in the coup. "The military coup that overthrew Mossadeq and his National Front cabinet was carried out under CIA direction as an act of U.S. foreign policy, conceived and approved at the highest levels of government," the document says, using a variation of the spelling of Mossadegh's name.

While this might be the CIA's first formal nod, the U.S. role has long been known.

President Barack Obama acknowledged the United States' involvement in the coup during a 2009 speech in Cairo.

"In the middle of the Cold War, the United States played a role in the overthrow of a democratically elected Iranian government," the president said.

In 2000, then-U.S. Secretary of State Madeleine Albright spoke of the intervention, and in the same year, the New York Times published what it said was a leaked 1954 CIA-written account of the overthrow.

Iranians elected Mossadegh prime minister in 1951. Quickly, the leader moved to nationalize oil production in the country -- a move that would have been a serious blow to the United States and Britain and a win for the USSR.

Because of the failure of oil negotiations with Iran, along with a number of other issues, the United States was concerned "that Iran was in real danger of falling behind the Iron Curtain."

"If that happened, it would mean a victory for the Soviets in the Cold War and a major setback for the West in the Middle East," Donald N. Wilber, a principal planner of the mission, wrote within months of the overthrow. "It was the aim of the TPAJAX project" -- that was the mission's code name -- "to cause the fall of the Mossadeq government; to reestablish the prestige and power of the Shah."

Shortly after Mossadegh's election, the CIA began to plan his overthrow. The goal of the coup was to elevate the strength of Shah Mohammad Reza Pahlavi and appoint a new prime minister -- Gen. Fazlollah Zahedi.

Before the coup, the agency -- along with the British Secret Intelligence Service -- helped foment anti-Mossadegh fervor using propaganda, according to CIA documents. "In Iran, CIA and SIS propaganda assets were to conduct an increasingly intensified effort through the press, handbills and the Tehran clergy in a campaign designed to weaken the Mossadeq government in any way possible," Wilber wrote.

On August 19, 1953, the coup swung into full effect as the CIA and British intelligence agency helped pull pro-Shah forces together and organized large protests against Mossadegh.

"The Army very soon joined the pro-Shah movement and by noon that day it was clear that Tehran, as well as certain provincial areas, were controlled by pro-Shah street groups and Army units," Wilber wrote. "By the end of 19 August ... members of the Mossadeq government were either in hiding or were incarcerated."

In order to provide Zahedi, the country's new prime minister, with some stability, the "CIA covertly made available $5,000,000 within two days of Zahedi's assumptions of power."

After the coup, Mossadegh was sentenced to death, but the sentence was never carried out. The former leader died in Tehran in 1967.

Even 60 years removed, the 1953 coup still hangs over U.S.-Iran relations.

Iranian politicians and religious leaders still use the coup as a way to foment anti-American sentiment. Mahmoud Ahmadinejad, Iranian president from 2005 until earlier this year, demanded apologies from the United States for "crimes" the CIA committed in Iran during the 1953 coup.

"The issue is more than academic," wrote Byrne of George Washington University. "Political partisans on all sides, including the Iranian government, regularly invoke the coup to argue whether Iran or foreign powers are primarily responsible for the country's historical trajectory, whether the United States can be trusted to respect Iran's sovereignty, or whether Washington needs to apologize for its prior interference before better relations can occur."

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on December 8, 1995

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CR. NO. 98-0057 |
| | ) | |
| | ) | VIOLATIONS |
| | ) | |
| | ) | 18 U.S.C. § 371 (Conspiracy); |
| | ) | 18 U.S.C. § 1001 (False |
| | ) | |
| v. | ) | Statements); |
| | ) | 18 U.S.C. § 2 (Willfully Causing |
| | ) | The Commission Of An Offense) |
| MARIA HSIA, | ) | |
| | ) | |
| A/K/A "HSIA LING," | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

FRIEDMAN, J. PLF

FILED IN OPEN COURT

FEB 1 8 1998

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

## I N D I C T M E N T

**The Grand Jury Charges:**

### INTRODUCTION

At all times relevant to this indictment:

1. Defendant, **MARIA HSIA (aka "HSIA LING")**, was an immigration consultant who worked and resided in the Los Angeles, California area.

2. The International Buddhist Progress Society ("IBPS"), doing business as the Hsi Lai Temple (the "Temple"), was incorporated under the laws of the State of California, with its headquarters in Hacienda Heights, California.

3. IBPS was a tax-exempt religious organization pursuant to

Case Related To _____ CR 98.29

Title 26, United States Code, Section 501(c)(3) of the Internal Revenue Code. As a tax-exempt organization, IBPS was prohibited from participating or intervening in any political campaign on behalf of any candidate for public office.

4. The Federal Election Campaign Act, Title 2, United States Code, Section 431 et seq. ("FECA") specifically prohibited, among other things:

    a. corporations from making contributions or expenditures in connection with the nomination and election of candidates for federal office (Title 2, United States Code, Section 441b(a));

    b. any person from making a contribution in the name of another person or knowingly permitting his or her name to be used to effect such a contribution (Title 2, United States Code, Section 441f).

5. In addition, the FECA, in particular Title 2, United States Code, Section 434, required that each treasurer of a political committee file periodic reports of receipts and disbursements to the Federal Election Commission ("FEC"). The reports identified each person who had made a contribution during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within the calendar year, together with the date and the amount of any such contribution. The reports also identified the mailing addresses and the occupations of such contributors, as well as the names of their employers.

6. The FEC was an agency of the United States government,

headquartered in Washington D.C., and entrusted with the responsibility of enforcing the reporting requirements of the FECA and for directing, investigating and instituting civil enforcement actions with respect to violations of the FECA, including the provisions referred to in paragraphs 4 through 5, above.   In addition, the FEC was responsible for making available to the public specific information about the amounts and sources of political contributions to federal candidates and their political committees.

7.   The Immigration and Nationality Act, Title 8, United States Code, Section 1101 et seq. ("INA"), and the regulations promulgated thereunder, provided, among other things, that:

a.   persons who are not citizens of the United States may apply to stay in the United States on a temporary or permanent basis by filing certain applications and documents with the Immigration and Naturalization Service ("INS");

b.   the INS reviews the applications and documents submitted and, if necessary, conducts further investigation, to determine whether to grant or deny the persons' applications;

c.   if a person applies for a religious worker (R-1) visa or a special immigrant religious worker visa, he or she is required, among other things, to be entering or remaining in the United States for the purpose of working for a bona fide nonprofit religious organization; that is, an organization exempt from taxation as described in section 501(c)(3) of the Internal Revenue Code as it relates to religious

3

organizations, or one that has never sought such exemption but establishes to the satisfaction of the INS that it would be eligible therefor if it had applied for tax exempt status.

8.   The INS was an agency of the United States government, headquartered in Washington D.C., and entrusted with the responsibility of administering and enforcing the requirements of the INA and all other laws relating to immigration, naturalization, and nationality, including the provisions referred to in paragraph 7, above.   In addition, the INS was responsible for investigating violations of the immigration and nationality laws.

### COUNT ONE - CONSPIRACY

9.   The grand jury realleges paragraphs 1 through 8, above, as though fully set forth herein.

10.   From mid-1993 and continuing through 1996, in the District of Columbia and elsewhere, defendant **MARIA HSIA**, and IBPS, not named as a defendant herein, did knowingly and willfully combine, conspire, confederate, and agree with and among each other and with persons known and unknown to the grand jury, to defraud the United States and, in particular, the FEC and INS, agencies of the United States, by impairing, obstructing, impeding, and defeating the FEC's and INS's lawful functions and duties, in violation of Title 18, United States Code, Section 371.

### The Objects of the Conspiracy

11.   It was an object of the conspiracy that defendant **MARIA**

4

HSIA, and co-conspirator IBPS, and others known and unknown to the grand jury, defrauded the United States by taking actions which impaired, obstructed, impeded, and defeated the FEC's lawful functions and duties by preventing the FEC from learning that IBPS had made unlawful political contributions.

12.   It was an object of the conspiracy that the defendant **MARIA HSIA**, and co-conspirator IBPS, and others known and unknown to the grand jury, defrauded the United States by taking actions which impaired, obstructed, impeded, and defeated the INS's lawful functions and duties by preventing the INS from learning that IBPS had made unlawful political contributions.

<u>The Manner and Means of the Conspiracy</u>

13.   Among the manner and means employed by defendant **MARIA HSIA**, co-conspirator IBPS, and other co-conspirators, to effect the conspiracy and to carry out its unlawful objects, were the following:

a.   From mid-1993 and continuing through 1996, defendant **MARIA HSIA**, and her co-conspirators, including IBPS, devised and executed a scheme whereby corporate money belonging to IBPS was used to make secret, disguised and illegal campaign contributions to federal, state, and local candidates and their political committees.

b.   Defendant **MARIA HSIA** and her co-conspirators, including IBPS, identified candidates and parties that they wished to support and thereafter solicited campaign contributions from

straw donors, known as "conduits," for the purpose of having the conduits pass on the funds to candidates as their own contributions. These conduits included, but were not limited to, nuns, monks, and volunteers from IBPS. Defendant **MARIA HSIA**, and her co-conspirators, including IBPS, used IBPS corporate funds to reimburse each conduit contributor in execution of the scheme. In addition, defendant **MARIA HSIA** made campaign contributions in her own name knowing that IBPS would reimburse her.

c.   By engaging in a long-standing pattern of using conduits to disguise illegal corporate contributions, defendant **MARIA HSIA** and co-conspirator IBPS concealed information from and caused false information to be conveyed to the FEC on numerous and separate occasions. Defendant **MARIA HSIA** and co-conspirator IBPS concealed from the FEC that IBPS was the true source of certain political contributions.

d.   Defendant **MARIA HSIA** and co-conspirator IBPS also concealed information from and caused false information to be conveyed to the INS on numerous and separate occasions. Defendant **MARIA HSIA** and co-conspirator IBPS submitted documents to the INS that concealed that IBPS had engaged in political activities and made political contributions. By their acts of concealment, defendant **MARIA HSIA** and co-conspirator IBPS sought to ensure that INS would permit nuns and monks and other persons associated with IBPS to enter or remain in the United States.

e.   In furtherance of their scheme to defraud, defendant **MARIA HSIA** and co-conspirator IBPS concealed and covered-up their

6

illegal activities.  In particular, IBPS destroyed, altered, and created documents, and disguised in its books and records the fact that IBPS had used corporate funds to make political contributions.

### The June 1993 March Fong Eu Contribution

14.  In 1993, March Fong Eu was the Secretary of State of California.  The March Fong Eu Campaign Committee 1994 was a political committee authorized to support March Fong Eu's re-election effort for Secretary of State.

15.  In June, 1993, defendant **MARIA HSIA** made a $500 contribution to March Fong Eu's campaign.  Co-conspirator IBPS paid defendant **MARIA HSIA** in full for her contribution by issuing a $500 corporate check to **HSIA**.  The conduit contribution was provided to the March Fong Eu Campaign Committee 1994.

### The September 1993 DNC Contributions

16.  On or about September 27, 1993, the Democratic National Committee ("DNC") held a fund-raising event at an office on Wilshire Boulevard in Los Angeles, California, which the Vice-President of the United States, Albert Gore, Jr., attended.  The DNC was an authorized federal political committee and as such was subject to the reporting provisions and campaign financing limitations of the FECA.

17.  Prior to the September 1993 event, defendant **MARIA HSIA** contacted IBPS personnel and requested that IBPS solicit $5,000 in contributions towards the event.  Co-conspirator IBPS thereafter

7

collected $5,000 in contributions by obtaining checks from three individuals associated with IBPS.  Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account.  The conduit contributions were provided to the DNC.

### The September 1994 Senator Kennedy Contributions

18.  In 1994, Senator Edward M. Kennedy of Massachusetts sought re-election to the United States Senate.  Kennedy for Senate was a federal political committee authorized to support the candidacy of Senator Kennedy and as such was subject to the reporting provisions and campaign financing limitations of the FECA.

19.  On or about September 8, 1994, a fund-raising event for Senator Kennedy was held at a residence in Beverly Hills, California.  Prior to the event, defendant **MARIA HSIA** contacted IBPS personnel and requested that IBPS solicit $5,000 in contributions towards the event.  Co-conspirator IBPS thereafter collected $5,000 in contributions by obtaining checks from three individuals associated with IBPS.  Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account.  The conduit contributions were provided to Kennedy for Senate.

### The September 1995 Clinton/Gore Contributions

20.  In 1995 and 1996, President William Jefferson Clinton sought re-election as the President of the United States.  During

8

that time, the Clinton/Gore '96 Primary Committee, Inc. ("Clinton/Gore '96") was a federal political committee authorized to support the candidacy of President Clinton and as such was subject to the reporting provisions and campaign financing limitations of the FECA.

21.  On or about September 21, 1995, a fund-raising event was held at the Century Plaza Hotel and Tower ("Century Plaza Hotel") in Los Angeles, California.  The Century Plaza event was sponsored by Clinton/Gore '96.  The cost to attend the event was $1,000 per person or $10,000 per ten-person table.

22.  During the spring and summer of 1995, defendant **MARIA HSIA** obtained contributions from two of her immigration clients in order to fill two $10,000 tables.  Shortly before the event, it appeared that one of the tables might not be filled.

23.  Defendant **MARIA HSIA** then contacted IBPS personnel and requested that IBPS solicit $10,000 in contributions towards the event.  Co-conspirator IBPS thereafter collected $2,500 checks from four individuals associated with IBPS, and provided the checks to defendant **HSIA**.  Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account.

24.  Defendant **MARIA HSIA** provided two of the $2,500 checks to one of her immigration clients to reimburse the client for contributions the client had made to Clinton/Gore '96.

### The November 1995 Senator Kennedy Contributions

25.  On or about November 11, 1995, another fund-raising event

9

for Senator Edward M. Kennedy was held at a Los Angeles, California residence.  Kennedy for Senate 1994 and Kennedy for Senate 2000 were federal political committees authorized to support the candidacy of Senator Kennedy and as such were subject to the reporting provisions and campaign financing limitations of the FECA.

26.  Defendant **MARIA HSIA** was one of the hosts of the event. Prior to the event, defendant **HSIA** contacted IBPS personnel and requested that IBPS solicit $3,000 in contributions towards the event.  Co-conspirator IBPS thereafter collected $3,000 in contributions by obtaining checks from two individuals associated with IBPS.  Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account.  The conduit contributions were provided to Kennedy for Senate 1994 and Kennedy for Senate 2000.

### The February 1996 DNC Contributions

27.  On or about February 19, 1996, the DNC held a dinner at the Hay Adams Hotel in Washington, D.C., which President Clinton attended.  On or about February 20, 1996, the DNC held a breakfast at the Hay Adams Hotel, which Vice-President Gore attended.  The cost to attend these fund-raising events was $12,500 per person.

28.  In or about February, 1996, **MARIA HSIA** contacted IBPS personnel and requested that IBPS solicit $25,000 in contributions towards the Hay Adams events.  Co-conspirator IBPS thereafter collected $25,000 in contributions by obtaining checks from nine

individuals associated with IBPS.  Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account.  The conduit contributions were provided to the DNC.

### The February 1996 Don Knabe Contribution

29.  In 1996, Don Knabe ran for election as Los Angeles County Supervisor in a district which included the Hsi Lai Temple.  Knabe for Supervisor was a political committee authorized to support the election effort of Don Knabe for Los Angeles County Supervisor.

30.  On or about February 28, 1996, defendant **MARIA HSIA** made a $1,500 contribution to Don Knabe for Supervisor.  On or about February 29, 1996, co-conspirator IBPS reimbursed defendant **HSIA** in full for her contribution to Knabe's campaign with a check drawn on a corporate bank account.  The conduit contribution was provided to Knabe for Supervisor.

### The April 1996 DNC Contributions

31.  On or about April 29, 1996, the DNC held an event at the Hsi Lai Temple in Hacienda Heights, California.  Vice-President Gore attended the event.

32.  In or about March and April 1996, defendant **MARIA HSIA,** together with IBPS personnel and others, solicited contributions for the event.  Prior to the April 29, 1996 event, individuals associated with IBPS wrote approximately $45,000 in checks to the DNC.  Co-conspirator IBPS paid three of the individuals, who contributed a total of $10,000, in full for their contributions.

33.   On or about April 30, 1996, the day following the Temple event, defendant **MARIA HSIA** contacted IBPS personnel and requested that IBPS solicit $55,000 in contributions towards the event.   Co-conspirator IBPS thereafter collected $55,000 in contributions by obtaining $5,000 checks from eleven individuals associated with IBPS.   Co-conspirator IBPS provided the checks to defendant **HSIA** and a DNC fund-raiser.   In or about late April, 1996, through early May, 1996, co-conspirator IBPS reimbursed each of the eleven individuals in full with checks drawn on a corporate bank account. The conduit contributions were provided to the DNC.

### The July 1996 DNC Contributions

34.   On or about July 22, 1996, the DNC sponsored a fund-raising event at the Century Plaza Hotel in Los Angeles, California.   President Clinton attended the event.

35.   Prior to the event, defendant **MARIA HSIA** contacted IBPS personnel and requested that IBPS solicit $10,000 in contributions towards the event.   Co-conspirator IBPS thereafter collected $10,000 in contributions by obtaining checks from two individuals associated with IBPS.   Co-conspirator IBPS reimbursed each individual in full with checks drawn on a corporate bank account. The conduit contributions were provided to the DNC.

### The October 1996 Patrick Kennedy Contributions

36.   In 1996, Congressman Patrick J. Kennedy of Rhode Island sought re-election to the United States House of Representatives.

The Friends of Patrick J. Kennedy '96 (the "Patrick Kennedy Committee") was a federal political committee authorized to support candidacy of Congressman Kennedy and as such was subject to the reporting provisions and campaign financing limitations of the FECA.

37.   Defendant **MARIA HSIA** and the Patrick Kennedy Committee Finance Director agreed to schedule an event for Congressman Kennedy at the Temple on October 5, 1996.  Defendant **HSIA** agreed to raise $5,000 for the event.

38.   On or about October 5, 1996, following the event, defendant **HSIA** provided five $1,000 contributions to Congressman Kennedy's Finance Director, four she had solicited from others and one from herself.

39.   On or about October 5, 1996, co-conspirator IBPS provided defendant **HSIA** with five $1,000 checks drawn on a corporate bank account to reimburse **HSIA** and the four others for their contributions to the Patrick Kennedy Committee.  Defendant **HSIA** gave each of the conduits a $1,000 reimbursement check, and kept one reimbursement check for herself which she deposited into her personal bank account.

## Overt Acts in Furtherance of the Conspiracy

40.   In furtherance of the aforesaid conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the District of Columbia and elsewhere:

   a.   Between 1993 and 1996, co-conspirator IBPS provided

defendant **MARIA HSIA** with its Articles of Incorporation.   The
Articles included the following:

> No substantial part of the activities of this corporation
> shall consist of carrying on propaganda, or otherwise
> attempting to influence legislation, and the corporation
> shall not participate or intervene in any political
> campaign (including the publishing or distribution of
> statements) on behalf of any candidate for public office.

    b.   Between 1993 and 1996, co-conspirator IBPS provided
to defendant **HSIA** a letter from the Internal Revenue Service
("IRS") District Director which indicated, among other things, that
(1) IBPS was exempt from federal income tax under Section 501(c)(3)
of the Internal Revenue Code; and (2) IBPS should report to the IRS
any change in operation, character or purpose of the organization
so that the IRS can consider the effect of the change on IBPS's tax
exempt status.

    c.   Between 1993 and 1996, co-conspirator IBPS provided
defendant **HSIA** with financial statements for IBPS that failed to
itemize funds expended for political activities or contributions.

    d.   Between 1993 and 1996, co-conspirator IBPS provided
defendant **HSIA** with certain forms (Forms 199: "California Exempt
Organization Annual Information Statement or Return") that
indicated that IBPS had not participated in any political campaign.

    e.   Between 1993 and 1996, defendant **HSIA** provided to
the INS: IBPS's Articles of Incorporation, letters from the IRS
District Director, IBPS's financial statements, and Forms 199.
Defendant **HSIA** provided these items to INS in order to obtain INS
approvals, including religious worker visas and special immigrant
religious worker visas, for persons associated with IBPS to enter

or remain in the United States.

f.  On or about June 4, 1993, co-conspirator IBPS issued a corporate check to defendant **HSIA** in the amount of $500.

g.  On or about June 9, 1993, defendant **HSIA** issued a check to March Fong Eu in the amount of $500.

h.  In or about September, 1993, defendant **HSIA** requested that co-conspirator IBPS solicit $5,000 in political contributions to the DNC.  On or about September 27, 1993, three persons associated with IBPS issued checks to the DNC totalling $5,000.

i.  On or about September 27, 1993, co-conspirator IBPS issued corporate checks to the three persons noted in paragraph (h), above.

j.  On or about January 31, 1994, defendant **HSIA** caused the DNC to file a report with the FEC in Washington, D.C., which falsely indicated that the three persons noted in paragraph (h), above, were the true sources of $5,000 in contributions to the DNC.

k.  In or about September, 1994, defendant **HSIA** requested that co-conspirator IBPS solicit $5,000 in political contributions to Senator Edward Kennedy's campaign.  On or about September 6, 1994, three persons associated with IBPS issued checks to Kennedy for Senate totalling $5,000.

l.  On or about September 6, 1994, co-conspirator IBPS issued corporate checks to the three persons noted in paragraph (k), above.

m.  On or about October 19, 1994, defendant **HSIA** caused Kennedy for Senate to file a report with the FEC in Washington,

D.C., which falsely indicated that the three persons noted in paragraph (k), above, were the true sources of $5,000 in contributions to Kennedy for Senate.

n.  In or about September, 1995, defendant **HSIA** requested that co-conspirator IBPS solicit $10,000 in political contributions to Clinton/Gore '96.  On or about September 20, 1995, four persons associated with IBPS issued $2,500 checks and provided them to IBPS.

o.  On or about September 20, 1995, co-conspirator IBPS issued $2,500 corporate checks to the four persons noted in paragraph (n), above.

p.  In or about late September, 1995, defendant **HSIA** gave two of the $2,500 corporate checks to one of her immigration clients.  Co-conspirator IBPS and defendant **HSIA** agreed that **HSIA** could retain the other two $2,500 corporate checks.

q.  In or about November, 1995, defendant **HSIA** requested that co-conspirator IBPS solicit $3,000 in political contributions to Senator Edward Kennedy's campaign.  On or about November 10, 1995, two persons associated with IBPS issued checks to Senator Kennedy's campaigns totalling $3,000.

r.  On or about November 10, 1995, co-conspirator IBPS issued corporate checks to the two persons noted in paragraph (q), above.

s.  On or about February 5, 1996, defendant **HSIA** caused Kennedy for Senate 1994 and Kennedy for Senate 2000 to file reports with the FEC in Washington, D.C., which falsely indicated that the

two persons noted in paragraph (q), above, were the true sources of $3,000 in contributions to Kennedy for Senate 1994 and Kennedy for Senate 2000.

t.   In or about February, 1996, defendant **HSIA** requested that co-conspirator IBPS solicit $25,000 in political contributions to the DNC.   Between on or about February 16, 1996 through on or about February 19, 1996, nine persons associated with IBPS issued checks to the DNC totalling $25,000.

u.   On or about February 16, 1996, co-conspirator IBPS issued corporate checks to the nine persons noted in paragraph (t), above.

v.   On or about April 15, 1996, defendant **HSIA** caused the DNC to file a report with the FEC in Washington, D.C., which falsely indicated that the nine persons noted in paragraph (t), above, were the true sources of $25,000 in contributions to the DNC.

w.   On or about February 28, 1996, defendant **HSIA** issued a check to Knabe for Supervisor in the amount of $1,500.

x.   On or about February 29, 1996, co-conspirator IBPS issued a corporate check to defendant **HSIA** in the amount of $1,500.

y.   In   or   about   March,   1996,   defendant   **HSIA**, representatives from IBPS, and others, met with Vice-President Gore at the White House.   At the meeting, representatives from IBPS invited Vice-President Gore to visit the Temple in April, 1996.

z.   In or about April, 1996, defendant **HSIA** requested that co-conspirator IBPS solicit political contributions to the DNC

17

in connection with Vice-President Gore's April 29, 1996 visit to the Temple.  In or about April, 1996, fourteen persons associated with IBPS issued checks to the DNC totalling $65,000.

aa.  In or about April, 1996, co-conspirator IBPS issued corporate checks to the fourteen persons noted in paragraph (z), above.

bb.  On or about July 15, 1996, defendant **HSIA** caused the DNC to file a report with the FEC in Washington, D.C., which falsely indicated that the fourteen persons noted in paragraph (z), above, were the true sources of $65,000 in contributions to the DNC.

cc.  In or about July, 1996, defendant **HSIA** requested that co-conspirator IBPS solicit $10,000 in political contributions to the DNC.  On or about July 22, 1996, two persons associated with IBPS issued checks to the DNC totalling $10,000.

dd.  On or about July 22, 1996, co-conspirator IBPS issued corporate checks to the two persons noted in paragraph (cc), above.

ee.  On or about October 15, 1996, defendant **HSIA** caused the DNC to file a report with the FEC in Washington, D.C., which falsely indicated that the two persons noted in paragraph (cc), above, were the true sources of $10,000 in contributions to the DNC.

ff.  In September, 1996, defendant **HSIA** telecopied a letter to the Abbess of the Temple, suggesting that co-conspirator IBPS contribute to several upcoming political events in California.

18

One event was to be held at the Temple for Congressman Patrick Kennedy in October, 1996.

gg.  In or about late September or early October, 1996, defendant **HSIA** requested that co-conspirator IBPS solicit $5,000 in political contributions to Congressman Kennedy's campaign.  Co-conspirator IBPS declined to find conduits or straw donors to contribute.

hh.  In or about early October, 1996, defendant **HSIA** solicited an attorney for a $1,000 contribution to Congressman Kennedy's campaign, and asked that the attorney solicit a $1,000 contribution from her boyfriend.

ii.  In or about early October, 1996, defendant **HSIA** solicited her business partner for $1,000 contributions to Congressman Kennedy's campaign.

jj.  On or about October 5, 1996, defendant **HSIA** received $1,000 contributions from four persons: the above-mentioned attorney, the attorney's boyfriend, and **HSIA's** business partner and his wife.  Defendant **HSIA** also made a $1,000 contribution to Congressman Kennedy's campaign.

kk.  On or about October 5, 1996, defendant **HSIA** provided the five $1,000 contributions listed in paragraph (jj), above, to Congressman Kennedy's Finance Director.

ll.  On or about October 5, 1996, co-conspirator IBPS provided defendant **HSIA** with five $1,000 corporate checks.

mm.  On or about October 5, 1996, defendant **HSIA** provided two of the $1,000 IBPS checks to the above-mentioned attorney.

19

nn.  On or about October 7, 1996, defendant **HSIA** provided two of the $1,000 IBPS checks to her business partner.

oo.  On or about October 7, 1996, defendant **HSIA** deposited the remaining $1,000 IBPS check into her personal bank account.

pp.  On or about October 24, 1996, defendant **HSIA** caused the Friends of Patrick Kennedy '96 to file a report with the FEC in Washington, D.C., which falsely indicated that defendant **HSIA** and the four persons noted in paragraph (jj), above, were the true sources of $5,000 in contributions to the Friends of Patrick Kennedy '96.

qq.  In or about November, 1996, and thereafter, co-conspirator IBPS destroyed documents relating to its participation in political campaigns, including contributions made in concert with defendant **HSIA**.

rr.  In or about November, 1996, and thereafter, co-conspirator IBPS altered the memorandum lines of numerous checks it had issued to conduit contributors, including defendant **HSIA**.

ss.  In or about November, 1996, and thereafter, co-conspirator IBPS altered its general ledgers to reflect that the reimbursement checks it had issued to conduit contributors were loans made by **IBPS**.  (Conspiracy, in violation of Title 18, United States Code Section 371).

## COUNT TWO - FALSE STATEMENTS

41.  The grand jury realleges paragraphs 1, 4 through 6, and

20 through 21, above, as though fully set forth herein.

42. On or about July 18, 1995, Clinton/Gore '96 filed a report with the FEC which listed all of the receipts and disbursements of Clinton/Gore '96 for the period between April 1, 1995 and June 30, 1995, and which falsely indicated that contributions totalling $4,000 had been received from four individuals, when in fact those individuals were not the actual contributors.

43. On or about July 18, 1995, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the FEC, defendant **MARIA HSIA** knowingly and willfully caused the submission of a material false statement to the FEC, in that defendant **HSIA** caused Clinton-Gore '96, a federal political committee, to file with the FEC a report for Clinton-Gore '96 that listed the following individuals (identified below by check number) as contributors to Clinton/Gore '96 in the following amounts, on the following dates, when, as defendant **HSIA** knew, in truth and in fact, the individuals named in the report were not the actual contributors:

| Contributor Falsely Identified in FEC Report (by Check #) | Amount | Date |
| --- | --- | --- |
| Check #741 | $1,000 | 6/26/95 |
| Check #0098 | $1,000 | 6/26/95 |
| Check #2544 | $1,000 | 6/26/95 |
| Check #209 | $1,000 | 6/26/95 |

(False Statements and Willfully Causing The Commission Of An Offense, in violation of Title 18, United States Code Section 1001, and Title 18, United States Code Section 2).

## COUNT THREE - FALSE STATEMENT

44.  The grand jury realleges paragraphs 1, 4 through 6, and 20 through 21, above, as though fully set forth herein.

45.  On or about October 17, 1995, Clinton/Gore '96 filed a report with the FEC which listed all of the receipts and disbursements of Clinton/Gore '96 for the period between July 1, 1995 and September 30, 1995, and which falsely indicated that contributions totalling $10,000 had been received from ten individuals, when in fact those individuals were not the actual contributors.

46.  On or about October 17, 1995, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the FEC, defendant **MARIA HSIA** knowingly and willfully caused the submission of a material false statement to the FEC, in that defendant **HSIA** caused Clinton-Gore '96, a federal political committee, to file with the FEC a report for Clinton-Gore '96 that listed the following individuals (identified below by check number) as contributors to Clinton-Gore '96 in the following amounts, on the following dates, when, as defendant **HSIA** knew, in truth and in fact, the individuals named in the report were not the actual contributors:

22

| Contributor Falsely Identified in FEC Report (by Check #) | Amount | Date |
|---|---|---|
| Check #332 | $1,000 | 8/25/95 |
| Check #188 | $1,000 | 9/1/95 |
| Check #766 | $1,000 | 9/1/95 |
| Check #1746 | $1,000 | 9/1/95 |
| Check #1111 | $1,000 | 9/1/95 |
| Check #543 | $1,000 | 9/1/95 |
| Check #0201 | $1,000 | 9/1/95 |
| Check #212 | $1,000 | 9/1/95 |
| Check #1213 | $1,000 | 9/1/95 |
| Check #594 | $1,000 | 9/1/95 |

(False Statements and Willfully Causing The Commission Of An Offense, in violation of Title 18, United States Code Section 1001, and Title 18, United States Code Section 2).

## COUNT FOUR - FALSE STATEMENT

47.   The grand jury realleges paragraphs 1, 4 through 6, 27 through 28, and 40(t)-(v), above, as though fully set forth herein.

48.   On or about April 15, 1996, the DNC filed a report with the FEC which listed all of the DNC's receipts and disbursements for the period between January 1, 1996 and March 31, 1996, and which falsely indicated that contributions totalling $25,000 had been received from nine individuals, when in fact those individuals were not the actual contributors.

49.   On or about April 15, 1996, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the FEC, defendant **MARIA HSIA** knowingly and willfully caused the submission of a material false statement to the FEC, in that defendant **HSIA** caused the DNC, a federal political committee, to file with the FEC a report for the DNC that listed the following individuals (identified below by check number) as contributors to the DNC in the following amounts, on the following dates, when, as defendant **HSIA** knew, in truth and in fact, the contributions had been made by IBPS:

| Contributor Falsely Identified in FEC Report (by Check #) | Amount | Date |
|---|---|---|
| Check #667 | $3,000 | 2/23/96 |
| Check #223 | $3,000 | 2/23/96 |
| Check #600 | $3,000 | 2/23/96 |
| Check #137 | $3,000 | 2/23/96 |
| Check #107 | $3,000 | 2/23/96 |
| Check #0486 | $3,000 | 2/23/96 |
| Check #194 | $2,500 | 2/23/96 |
| Check #304 | $2,500 | 2/23/96 |
| Check #0269 | $2,000 | 2/23/96 |

(False Statements and Willfully Causing The Commission Of An Offense, in violation of Title 18, United States Code Section 1001, and Title 18, United States Code Section 2).

24

<u>COUNT FIVE - FALSE STATEMENT</u>

50.   The grand jury realleges paragraphs 1, 4 through 6, 31 through 33, and 40(y)-(bb), above, as though fully set forth herein.

51.   On or about July 15, 1996, the DNC filed a report with the FEC which listed all of the DNC's receipts and disbursements for the period between April 1, 1996 and June 30, 1996, and which falsely indicated that contributions totalling $65,000 had been received from fourteen individuals, when in fact those individuals were not the actual contributors.

52.   On or about July 15, 1996, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the FEC, defendant **MARIA HSIA** knowingly and willfully caused the submission of a material false statement to the FEC, in that defendant **HSIA** caused the DNC, a federal political committee, to file with the FEC a report for the DNC that listed the following individuals (identified below by check number) as contributors to the DNC in the following amounts, on the following dates, when, as defendant **HSIA** knew, in truth and in fact, the contributions had been made by IBPS:

| Contributors Falsely Identified in FEC Report (by Check #) | Amount | Date |
|---|---|---|
| Check #221 | $5,000 | 4/30/96 |
| Check #195 | $5,000 | 4/30/96 |
| Check #140 | $5,000 | 4/30/96 |

| Check #102  | $5,000 | 4/30/96 |
| Check #121  | $5,000 | 4/30/96 |
| Check #243  | $5,000 | 4/30/96 |
| Check #0509 | $5,000 | 4/30/96 |
| Check #497  | $5,000 | 4/30/96 |
| Check #0702 | $5,000 | 4/30/96 |
| Check #1016 | $5,000 | 4/30/96 |
| Check #1646 | $5,000 | 4/30/96 |
| Check #227  | $5,000 | 4/30/96 |
| Check #1808 | $2,800 | 4/30/96 |
| Check #141  | $2,200 | 4/30/96 |

(False Statements and Willfully Causing The Commission Of An Offense, in violation of Title 18, United States Code Section 1001, and Title 18, United States Code Section 2).

## COUNT SIX - FALSE STATEMENT

53.   The grand jury realleges paragraphs 1, 4 through 6, 36 through 39, and 40(ff)-(pp) above, as though fully set forth herein.

54. On or about October 24, 1996, the Patrick Kennedy Committee filed a report with the FEC which listed all of the Patrick Kennedy Committee's receipts and disbursements for the period between October 1, 1996 and October 16, 1996, and which falsely indicated that contributions totalling $5,000 had been received from four individuals and defendant, **MARIA HSIA**, when in

26

fact those individuals were not the actual contributors.

55.  On or about October 24, 1996, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the FEC, defendant **MARIA HSIA** knowingly and willfully caused the submission of a material false statement to the FEC, in that defendant **HSIA** caused the Patrick Kennedy Committee, a federal political committee, to file with the FEC a report for the Patrick Kennedy Committee that listed the following individuals (identified below by check number) as contributors to the Patrick Kennedy Committee in the following amounts, on the following dates, when, as defendant **HSIA** knew, in truth and in fact, the contributions had been made by IBPS:

| Contributor Falsely Identified in FEC Report (by Check #) | Amount | Date |
|---|---|---|
| Check #1214 | $1,000 | 10/5/96 |
| Check #1011 | $1,000 | 10/5/96 |
| Check #341 | $1,000 | 10/5/96 |
| Check #342 | $1,000 | 10/5/96 |
| **MARIA HSIA** (Check #199) | $1,000 | 10/5/96 |

(False Statements and Willfully Causing The Commission Of An Offense, in violation of Title 18, United States Code Section 1001, and Title 18, United States Code Section 2).

A TRUE BILL:

Foreperson

*Wilma A. Lewis /RB*

Attorney of the United States in and for the District of Columbia

Eric L. Yaffe
Dabney Langhorne
Trial Attorneys
Public Integrity Section
Campaign Financing Task Force
Criminal Division
U.S. Department of Justice
1001 G Street, N.W.
Washington, D.C.  20001
202-307-0655

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NUMBER: |
| Plaintiff, | 1:18-cr-00032-DLF |
| v. | |
| INTERNET RESEARCH AGENCY LLC, *et al*., | |
| Defendants. | |

**[Proposed] ORDER**

Upon consideration of Defendant Concord Management and Consulting, LLC's Motion Pursuant to Rule 6(e)(3)(E)(ii) for *In Camera* Inspection of Legal Instructions Provided to the Grand Jury Regarding Count One of the Indictment, it is hereby **ORDERED** that the motion is **GRANTED**.

SO ORDERED.


Dated: _____        _____
                                       Dabney L. Friedrich
                                       United States District Judge